UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

McKESSON INFORMATION
SOLUTIONS, INC.,

      Plaintiff,

    v.

BRIDGE MEDICAL, INC.,

      Defendant.

NO. CIV. S-02-2669 FCD KJM

MEMORANDUM AND ORDER

----oo0oo----

This matter is before the court on the parties' cross-motions for summary adjudication of defendant Bridge's Medical Inc.'s ("Bridge") affirmative defense of invalidity for obviousness.[1]  35 U.S.C. § 103.  By that defense, Bridge seeks a finding that the subject patent[2] held by plaintiff McKesson Information Solutions, Inc. ("McKesson") is invalid as obvious

---

[1]    Bridge also moved for summary adjudication of its counter-claim for declaratory relief on the same grounds.  (Amd. Counter-Compl., filed July 16, 2003.)

[2]    U.S. Patent No. 4,857,716 ("the '716 patent")

over the prior art teaching all of its elements as construed by
the court.[3]

For the reasons set forth below, both parties' motions are
DENIED with respect to Bridge's affirmative defense of invalidity
on the basis of obviousness.[4]  Triable issues of fact remain
regarding whether the prior art describes each element of the
'716 invention and whether those of ordinary skill in the art
would be motivated to combine the subject references.[5]

**BACKGROUND**

The facts pertaining specifically to this defense/counter-
claim are contained in the parties' respective experts'
declarations.  Rather than describing those opinions here, the
court discusses the experts' opinions below within the analysis

---

[3]   In its amended answer and counter-claim, Bridge
asserted a defense/counter-claim for invalidity on several bases,
including obviousness, anticipation (35 U.S.C. § 102), and
adequacy of written description (35 U.S.C. § 112).  Bridge's
Section 112 defense was not raised in the instant motions.
However, its Section 102, anticipation, defense was raised by
McKesson in its cross-motion.  In opposition thereto, Bridge
conceded that "its defense of anticipation under [Section 102] is
no longer viable in light of the [court's] *Markman* order
[construing the patent's claim elements]."  (Opp'n to McKesson's
MSJ re: Invalidity, filed July 15, 2005, 1:10-11.)  As such,
McKesson is entitled to summary adjudication in its favor on this
defense.

[4]   Because oral argument will not be of material
assistance, the court orders this matter submitted on the briefs.
E.D. Cal. L.R. 78-230(h).

[5]   The court notes that footnote 6 in its concurrently
filed order on the parties' cross-motions for summary
adjudication of Bridge's affirmative defense of unenforcability
for inequitable conduct, likewise applies here.  The court once
again cannot discern the reason for the filing of these motions
where the parties' disclosed experts maintain such divergent
opinions, and there is no apparent evidentiary basis to exclude
the testimony.

2

1  section of the order as it is the experts' conflicting opinions

2  which preclude an award of summary adjudication to either party.

3  **STANDARD**

4      Summary judgment is appropriate when, based on the record,

5  no genuine issue exists as to any material fact, and the moving

6  party is entitled to judgment as a matter of law.  Fed. R. Civ.

7  P. 56(c).  A genuine issue of material fact exists if the

8  evidence is such that a reasonable jury could find in favor of

9  the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

10  242, 248 (1986).

11      When evaluating a motion for summary judgment, the court

12  views the evidence through the prism of the evidentiary standard

13  of proof that would pertain at trial on the merits.  <u>Id.</u> at 255.

14  Under the patent statutes, a patent enjoys a presumption of

15  validity (35 U.S.C. § 282) which can be overcome only through

16  clear and convincing evidence.  <u>Eli Lilly & Co. v. Barr</u>

17  <u>Laboratories, Inc.</u>, 251 F.3d 955, 962 (Fed. Cir. 2001).  "Thus, a

18  moving party seeking to invalidate a patent at summary judgment

19  must submit such clear and convincing evidence of invalidity so

20  that no reasonable jury could find otherwise."  <u>Id.</u>

21  Alternatively, a moving party seeking a finding of no invalidity

22  must show that the nonmoving party, who bears the burden of proof

23  at trial, failed to produce clear and convincing evidence on an

24  essential element of a defense upon which a reasonable jury could

25  invalidate the patent.  <u>Id.</u>  "In determining whether a genuine

26  issue of material fact exists, the court views the evidence in

27  the light most favorable to the nonmoving party and resolves all

28  doubts in its favor."  <u>Id.</u>

3

1                              **ANALYSIS**

2        A patent is invalid for obviousness when the differences

3   between the claim and the prior art "are such that the subject

4   matter as a whole would have been obvious at the time the

5   invention was made to a person having ordinary skill in the art."

6   35 U.S.C. § 103(a).  While typically a defendant, asserting

7   invalidity, is required to present "clear and convincing

8   evidence" of obviousness to invalidate a patent under Section

9   103(a), where the obviousness challenge is based on "a reference

10  that was not before the examiner [as alleged here by Bridge] . .

11  . the alleged infringer's burden may be more easily carried

12  because of this additional reference."  SIBIA Neurosciences, Inc.

13  v. Cadus Pharmaceutical Corp., 225 F.3d 1349, 1355-56 (Fed. Cir.

14  2000).  Ultimately, whether a patent is invalid based on Section

15  103(a) is for the court to decide as a matter of law.  Id. at

16  1355.  However, that legal determination must be based on

17  underlying factual inquiries, including: "(1) the scope and

18  content of the prior art; (2) the level of ordinary skill in the

19  prior art; (3) the differences between the claimed invention and

20  the prior art; and (4) objective evidence of nonobviousness."

21  Brown & Williamson Tobacco Corp. v. Philip Morris Inc., 229 F.3d

22  1120, 1124 (Fed. Cir. 2000) (citations omitted).

23       When an obviousness determination relies on the combination

24  of two or more references, "there must be some suggestion or

25  motivation to combine the references."  WMS Gaming Inc. v. Int'l

26  Game Tech., 184 F.3d 1339, 1355 (Fed. Cir. 1999).  The

27  determination cannot be based on the "hindsight combination of

28  components selectively culled from the prior art to fit the

                                    4

parameters of the patented invention." <u>Crown Operations Int'l,</u>
<u>Ltd. v. Solutia Inc.</u>, 289 F.3d 1367, 1376 (Fed. Cir. 2002).
Rather, "[t]here must be a teaching or suggestion within the
prior art, within the nature of the problem to be solved, or
within the general knowledge of a person of ordinary skill in the
field of invention, to look to particular sources, to select
particular elements, and to combine them as combined by the
inventor." <u>Id.</u>  This so-called "motivation to combine" "must be
clear and particular, and it must be supported by actual
evidence." <u>Teleflex, Inc. v. Ficosa North America Corp.</u>, 299
F.3d 1313, 1334 (Fed. Cir. 2002).

> **1.   Content of the Prior Art**

Here, Bridge argues that the published proceedings of the
<u>First Annual Symposium on Computer Applications in Medical Care</u>
(the "Symposium Proceedings") and Motorola Inc.'s U.S. Patent No.
4,731,813 (the "'813 Patent") are prior art references[6] skilled
artisans at the time of the invention of the '716 patent would
have been motivated to combine, and the combination contains each
and every element of claim 1 of the '716 patent.  These arguments
are supported by the declaration of Bridge's technical expert,
Dr. Lawrence Fagan ("Fagan").  (Fagan Decl., filed July 1, 2005.)

Regarding the latter argument, that the two references
contain all elements of claim 1 of the '716 patent, Fagan finds
that Dr. Martin Rubin's section of the Symposium Proceedings
entitled "Mechanized Information Transfer in the Medical

---

[6]    Bridge does not dispute that these references are
"*prior*" art in that they were published or filed more than one
year before the '716 patent's filing date.  (Bridge's Stmt. of
Undisp. Facts ["UF"], filed July 1, 2005, ¶s 43, 76.)

Environment" provides a clear description of the development of bar code scanning for patient identification and verification. (Id. at ¶ 10.)  Specifically, it teaches, among other things, (like the subsequent '716 patent): (a) a "system . . . which unambiguously links the patient, sample, requested tests and analytical results of the clinical laboratory" and "is equally applicable to other patient services such as the administration of blood, drugs and diet"; (b) the "major elements" of this system provide for the "instant transfer of human and machine readable alpha numeric information form a source such as a patient wrist bracelet or badge"; (c) "a hand held wand or a laser scanner"; (d) attached to a "display data terminal" with "keyboard" that provides "interactive communication with [sic] the [remote] computer in the system" is used to check; (e) "the wrist bracelet bar coded patient identification number against the bar coded patient identification number . . . affixed to the requested service[.]"  (UF ¶ 46.)  The Symposium Proceedings further discuss advances and uses of microprocessors in medical devices and the advantages in price, speed, and portability of microprocessors.  (UF ¶ 47.)  Additionally, they highlight how the evolution of the microprocessor allows "the size of circuitry to shrink," and allows new smaller computer designs to be used where the older computers were "possibly too big for portable instruments."  (UF ¶ 48.)  Finally, like the '716 patent, the Symposium Proceedings describe a distributed microcomputer system for the monitoring, information gathering, patient data comparison, and alarm system for use with critically ill patients.  (UF ¶ 49.)

1    Regarding the remaining elements of the '716 patent, Fagan

2  finds that the '813 patent teaches the hardware components and

3  communication features of the patent.  (UF ¶s 77-97.)   He

4  describes that among other things, the '813 patent teaches a

5  telephonic system utilizing: (a) "two-way radio [RF]

6  communications" between a "base station" and "handheld units";

7  (b) "the base and portable units each include a duplex

8  transceiver and antenna which together provide a wireless

9  communication link between the two units"; (c) a "security

10 circuit in each unit allows communication with other units only

11 upon the reception of an address code corresponding to an address

12 code stored in the unit"; (d) an "ID code or security address,

13 . . . unique to that base station unit, is stored" in its

14 programmable "read only memory (ROM)"; (e) "the address code of

15 the base unit is entered into the portable unit by encoding

16 circuitry" when "the portable unit is seated in the base unit

17 receptacle"; and (f) the "base station unit" is connected by

18 means of "cable and conventional telephone line connectors" to a

19 "network" or "master computer[.]"  (UF ¶ 78.)  Fagan thus

20 concludes that in combination, the Symposium Proceedings and the

21 '813 patent plainly teach every element of claim 1 of the '716

22 patent. (UF ¶ 101 [see Ex. H to Fagan Decl., chart describing how

23 each element of claim 1 is revealed by these prior art

24 references]).

25    Bridge's showing is rebutted by McKesson's technical expert,

26 Dr. Harry V. Bims ("Bims"), who does not agree that the Symposium

27 Proceedings and the '813 patent describe all of the elements of

28 claim 1 of the '716 patent.  (Bims Decl., filed July 15, 2005, ¶

1  109 ["[I]t is my opinion that numerous claim elements are not

2  disclosed in the references relied on by Dr. Fagan in his

3  declaration."])  For example, according to Dr. Bims, "The '813

4  patent relates to a cordless, portable telephone for use with the

5  standard telephone network.  As such, there is nothing in the

6  '813 patent that relates to patient identification or

7  verification, bar codes, bar code reader means, or a central

8  programmed system computer used to verify that patient and item

9  data correspond."  (Id. at ¶ 113; see also ¶s 109-110 [chart

10  describing each element of claim 1 and Bims' specific

11  disagreement with Fagan].)

12      This factual dispute between the parties' experts as to the

13  "scope and content of the prior art," *alone*, prevents an award of

14  summary adjudication to either party on this issue.  Brown &

15  Williamson Tobacco Corp., 229 F.3d at 1124.  While Bridge's

16  burden of proof is lessened here because the subject prior art

17  references were not disclosed to the PTO, Bridge nonetheless, has

18  not established its case as a matter of law in light of Bims'

19  rebuttal declaration.  Because the evidence, relating to whether

20  the prior art describes the elements of claim 1 of the '716

21  patent, is "reasonably inferable either way," the issue cannot be

22  decided as a matter of law.  Paragon Podiatry Laboratory, Inc. v.

23  KLM Laboratories, Inc., 984 F.2d 1182, 1190 (Fed. Cir. 1993).

24      Notwithstanding the above, the court also notes that the

25  parties' experts likewise dispute the applicable "level of

26  ordinary skill in the field" used for making the obviousness

27  determination.  Id.  Fagan maintains that a person of ordinary

28  skill in the art to which the '716 patent pertains would have "at

8

least a Bachelor of Science in Computer Science or Electrical
Engineering, or the equivalent thereof, and with at least two
years of practical engineering experience (Fagan Decl., filed
July 1, 2005, ¶ 8); whereas, Bims asserts the person of ordinary
skill would have "at least an undergraduate degree in electrical
engineering as well as a background in wireless communications
through either graduate courses or work experience." (Bims
Decl., ¶ 14.)

Finally, the parties' experts further dispute whether there
are objective factors of nonobviousness present in this case.
Evidence that a claimed invention has had commerical success;
been widely licensed; satisfied a long-felt need; provided a
solution to an unsolved problem or was copied by others, may
militate against a finding of obviousness. B.F. Goodrich Co. V.
Aircraft Braking Sys. Corp., 72 F.3d 1577, 1582 (Fed. Cir. 1996).
It is Mckesson's burden to come forward with any such evidence
and to show "a nexus . . . between the claimed features of the
invention and the objective evidence offered to show non-
obviousness." WMS Gaming, 184 F.3d at 1359.  Bridge argues
McKesson has no evidence of these secondary considerations or the
required nexus.  According to Fagan, because multiple prior art
references taught point of care bar coding solutions, there is no
basis upon which McKesson can demonstrate a nexus between the
'716 patent and the commercial success of current bar coding
solutions. (Fagan Decl., ¶s 9-18.)  Additionally, although the
'716 patent was issued some fifteen years ago, it has no
licensing history.  Thus, Fagan concludes there is no evidence to
credit the '716 invention with solving a continuing problem or

1  for any commercial success.  (UF ¶ 106.)

2      However, through Bims, McKesson offers evidence of "long

3  felt need and [the] failure of others" to show nonobviousness.

4  (Bims Decl., ¶ 130-133.)  According to Bims, by 1985, there

5  existed a strong need for a system that could reduce paper work,

6  verify patient identification, check for drug incompatiblities,

7  etc.  The '716 invention specifically addressed this long felt

8  need through its novel system of bar codes, portable terminals,

9  base stations, and a main computer tracking patients, specimens,

10  and drugs.  Additionally, Bims asserts that even the prior art

11  relied on by Fagan, demonstrates that those in the art, at the

12  time, were trying to solve these problems but had failed to do

13  so.  For example, the '381 patent filed in 1982 by Rubin, an

14  attendee and presenter at the Symposium Proceedings, attempted

15  but failed to solve the problem articulated in both Rubin's

16  article from the Symposium, relied on by Bridge, and later in the

17  '716 patent.  Bims concludes:

18      Based on the very references relied upon by Dr. Fagan,
        there was a need for a system that could solve the
19      problems addressed by the '716 patent for at least
        eight (8) years (and more properly decades), yet despite
20      as many as 1 in 6 errors in medication administration,
        there was no solution to it and the 'leaders' in the
21      field had failed to come up with one.

22  (Id. at ¶ 133.)

23      Therefore, on these additional bases, the court finds

24  triable issues of fact remain precluding an award of summary

25  adjudication on the issue of invalidity for obviousness.

26      **2.   Motivation to Combine**

27      For the same reason as above, summary adjudication is

28  inappropriate for the further reason that triable issues of fact

10

exist as to the "motivation to combine" the relevant references.
According to Fagan, a motivation to combine can be gleaned from
the following:  The Symposium Proceedings[7] reference work by
Motorola to develop smaller and more portable microcomputers for
use in the hospital environment.  (UF ¶ 103.)  They specifically
point out several of the common microprocessors at the time,
including the Motorola 6800 chip.  (UF ¶ 104.)  Fagan contends
this demonstrates the importance and linkage of microprocessors
in medical devices and implicitly points researchers to Motorola
as a leader in microprocessor technology for medical applications
at the time.  Fagan thus concludes that a person of ordinary
skill in the art reviewing the Symposium Proceedings would be
motivated to consider the work of Motorola when looking at the
problem the Rubin article was trying to solve.  (Id.)  In fact,
the work of Rubin and Motorola in their respective fields was
deemed so pertinent to the field of endeavor of the '716 patent
that a Rubin patent (U.S. Patent No. 4,473,884) and two of
Motorola's patents in this area (U.S. Patent No. 4,593,155 to
Hawkins and 4,486,624 to Puhl) were both cited during the '716

---

[7]    Fagan treats the Symposium Proceedings (which includes
some 373 pages) as *one* reference, despite the fact that it
contains sections written by different authors representing
lectures given separately.  Fagan asserts that because the
articles are all part of the same conference and were published
and indexed together and consecutively numbered, persons of
ordinary skill in the art would treat them as one reference.
(Fagan Opp'n Decl., filed July 1, 2005, ¶ 20.)  As in all other
respects described herein, Bridge's expert Bims disagrees.  (Bims
Decl., ¶s 114, 140.)  He argues that the Symposium Proceedings
(involving a collection of more than 70 papers presented by 164
authors from diverse fields) are multiple references, and thus
Bridge is required to demonstrate how a person of ordinary skill
in the art would be motivated to combine the *precise* articles
(there are 3 of them) relied on by Bridge for its obviousness
combination.

11

1   prosecution as relevant art. (UF ¶ 105.)

2       To the contrary, Bims finds that a person of ordinary skill
3   in the art would not be motivated to combine these references.
4   (Bims Decl., ¶s 115-129.)  According to Bims, the simple
5   reference to "Motorola" as facilitators of microprocessors would
6   "not suggest to those of ordinary skill in the art the
7   desirability of combining Motorola's cordless phone patents with
8   bar code readers to arrive at the features of the ['716 patent]."
9   (Id. at ¶s 116, 121.)  Something more would be required.  In
10  Bims' opinion, even if there was a growing popularity in the use
11  of microprocessors in medical instruments, that would not provide
12  a motivation for a person to look to specific references (e.g.
13  cordless phones) to select particular elements from them or to
14  combine them as the inventors did.  (Id.)  Finally, he disagrees
15  that a person of ordinary skill in the art would be motivated to
16  combine the three specific references relied on by Fagan from the
17  Symposium Proceedings.  Bims states:

18          None of these articles discuss medication errors
            at the point of administration nor do they discuss
19          verifying and identifying a patient and patient
            care related items and transmitting that data
20          wirelessly.  Not only do the articles not appear
            to disclose the invention from the patent, they
21          are each unique topics in and of themselves and
            do not contain any overlapping topics or
22          references which may motivate a person of ordinary
            skill in the art to combine them with other
23          references.

24  (Id. at ¶ 126.)

25      This brief description of some of Fagan's and Bims' opinions
26  sufficiently demonstrates a clear dispute of fact on this issue.
27  While their opinions and analysis are more extensive, for
28  purposes of this order, these disputed issues of material fact

12

1  are sufficient to deny the motions.

2                          **CONCLUSION**

3       For the foregoing reasons, the parties' cross-motions for

4  summary adjudication of Bridge's affirmative defense/counter-

5  claim for invalidity on the basis of obviousness are DENIED.[8]

6       IT IS SO ORDERED.

7  DATED: August 10, 2005.

8                              /s/ Frank C. Damrell Jr.
                               FRANK C. DAMRELL, Jr.
9                              UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27       [8]    As indicated in footnote 3 above, McKesson's motion for
   summary adjudication of Bridge's anticipation
28  defense/counterclaim is GRANTED.

                              13