IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| McKESSON INFORMATION SOLUTIONS, INC., | No. CIV S-02-2669 FCD KJM |
| Plaintiff, | |
| vs. | |
| BRIDGE MEDICAL, INC., | FINDINGS AND RECOMMENDATIONS |
| Defendant. | |
| _____/ | |

By order filed August 11, 2005, this matter was referred to the undersigned for findings and recommendations on defendant's motion for summary judgment of non-infringement filed July 1, 2005. Upon review of the documents in support and opposition, the matter being submitted, and good cause appearing, THE COURT FINDS AS FOLLOWS:

I. Background[1]

Defendant is engaged in the business of selling, offering to sell, making, using, marketing, testing, installing and demonstrating a system known as the MedPoint System.

---

[1] This factual characterization of relevant aspects of the case is presented here in the light most favorable to plaintiff, the nonmoving party on the motion. Whether or not plaintiff has pointed to sufficient factual support for its positions to survive summary judgment is analyzed below.

1

McKesson's Response to Bridge's Statement of Undisputed Facts,[2] Disputed Fact ("DF") 2. The system comprises software-programmed hardware that, as a whole, performs computer networking, systems integration, bar code scanning to help prevent problems in hospitals with administration of medications, blood transfusions, and specimen identification error. DF 7. Defendant sells the system, which includes software and services related to deploying the system. DF 8. In addition to directly selling software and services, even though defendant's documents contain language denying defendant sells hardware, defendant has provided hardware to several customers, and has loaned personal digital assistant devices ("PDAs") to at least two customers. DF 9. The overall system offered by defendant infringes plaintiff's patent, which covers a patient identification and verification system comprised of programmed hardware. DF 1, 11.

The court previously has construed claim elements of claim 1 of plaintiff's patent, including the "base station means" and "communication" claim elements at issue on the pending motion. The "base station means" claim element, as a means-plus-function element, has been construed as performing the function of "receipt of and transmission of the patient and item data" and "only allowing communication with a portable handheld patient terminal means having a corresponding program identifier." DF 19. While "communication" has been construed as "transmission of information from one point to another," Undisputed Fact (UF) 20, the series of

---

[2] In its response to defendant's Statement of Undisputed Facts, plaintiff has not complied fully with Local Rule 56-260, which requires for each disputed fact "a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission or other document relid upon in support of that denial." Plaintiff also has not filed a separate Statement of Disputed Facts, which is optional. Given its interest in resolving disputed matters on the merits, this court has carefully reviewed the evidence cited in plaintiff's response to the Undisputed Facts, however incomplete, as well as additional evidence cited in plaintiff's opposition brief and relevant portions of plaintiff's expert's declaration, to the extent the evidence has been made a matter of record. Some of the evidence cited by plaintiff appears to have not been filed, or not filed under the exhibit denominator provided. Such evidence includes: excerpts from the Webha deposition, Declaration of Dr. Harry V. Bims [docket no. 511] (Bims Decl.) ¶ 61 (Exhibit T includes excerpts other than those cited here, and the Webha deposition does not appear to have been lodged in its entirety, see Local Rule 5-133(j)); and a document labeled BR002180, id. ¶ 61 (Exhibit PP includes pages other than the page cited here).

events that happen in the type of IEEE 802.11[3] wireless network relied on by defendant, namely the sending of probe and beacon signals, between a client device (such as a laptop, desktop or tablet computer) and an access point (microprocessor controlled unit that incorporates a transceiver for receiving and transmitting data wirelessly) when they first come into communication range of each other without regard to whether the client device has the access point's corresponding identifier do not qualify as "communications" as that term is used in claim 1. DF 21, 22. Specifically, the probe signals are control signals that do not contain information to be exchanged between client device and access point, DF 23, but rather contain unique identifiers that allow a client device to search out an access device with the same identifier. DF 24, 25.

The structure corresponding to the "base station means" has been construed to include, among other structural components, a "location for insertion of a portable handheld terminal." UF 26. The access points in the wireless system in which defendant's software is used incorporate memory, an RF modem and antenna, and a programmed microprocessor, which combined are the structural equivalent of a "location for insertion of a portable handheld patient terminal." DF 27. Such access points are used by defendant and its customers in implementing the MedPoint System. DF 27, 28, 29.

In the context of defendant's wireless system, it is simpler to connect wirelessly compared to connecting two devices physically as in plaintiff's invention, namely by inserting a portable handheld into a base station unit; also, physical interconnection does not provide for interference-free direct transfer of information. DF 35. While the court's construction of the "portable handheld patient terminal" claim element is "a device that is used or operated while held in the hand or hands," this construction does not require that an infringing system include a device actually used this way. DF 36. While defendant argues that the vast majority of its clients

---

[3] IEEE 802.11 refers to a set of standards for wireless networks developed by a working group of the Institute of Electrical and Electronic Engineers. See www.ieee.org.

1  use a client device that is affixed to a cart or stand, and thus is operated without being held in the
2  hand or hands, the evidence does not support this characterization, DF 38, 39, and a "handheld"
3  device is not simply transformed into a non-handheld by virtue of being affixed to a cart or stand.
4  In fact, defendant has used handheld devices in testing versions of the MedPoint System at its
5  own facilities, and in demonstrations of the system for customers or potential customers. Bims
6  Decl. ¶¶ 39-43 (and exhibits cited therein). Moreover, defendant has admitted in the course of
7  this litigation that it needs to be free to offer handheld devices as part of its system in order to not
8  suffer substantial harm to its business. Declaration of Nicole M. Norris [docket nos. 507, 523]
9  (Norris Decl.), Ex. HHH.

10  II. Summary Judgment Standards

11      A. Summary Judgment in Patent Cases Generally

12      "Summary judgment is appropriate in a patent case, as in other cases, when there
13  is no genuine issue as to any material fact and the moving party is entitled to judgment as a
14  matter of law." Nike Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 646 (Fed. Cir. 1994);
15  Fed. R. Civ. P. 56(c).

16      Under summary judgment practice, the moving party

17  always bears the initial responsibility of informing the district court
     of the basis for its motion, and identifying those portions of "the
18  pleadings, depositions, answers to interrogatories, and admissions
     on file, together with the affidavits, if any," which it believes
19  demonstrate the absence of a genuine issue of material fact.

20  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the
21  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary
22  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers
23  to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered,
24  after adequate time for discovery and upon motion, against a party who fails to make a showing
25  sufficient to establish the existence of an element essential to that party's case, and on which that
26  party will bear the burden of proof at trial. See id. at 322; Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 252, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) (inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits"). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Celotex, 477 U.S. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
/////

genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the pending summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

Summary judgment of non-infringement is "appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial." TechSearch L.L.C. v. Intel Corp., 286 F.3d 1360, 1369 (Fed. Cir. 2002), cert. denied, 537 U.S. 995 (2002). Summary judgment in this case must be denied, however, if after viewing the evidence through the prism of the substantive evidentiary burden, and resolving all doubts and making all reasonable inferences in plaintiff's favor, a reasonable trier of fact could find defendant has not shown plaintiff has failed to establish infringement. Anderson, 477 U.S. at 254.

Determining whether a patent has been infringed requires a two step analysis of (1) claim construction and (2) comparison of the properly construed claims to the accused product. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). In this case, the first step of claim construction is completed.

See Order (filed June 7, 2005). In the second step of comparing claims, a patentee must show, by a preponderance of the evidence, that the accused device contains each limitation of the asserted claim (i.e., literally infringes) or an equivalent of each such limitation (i.e., infringes by equivalence). Electro Scientific Industries, Inc. v. Dynamic Details, Inc., 307 F.3d 1343, 1350 (Fed. Cir. 2002); S. Bravo Systems, Inc. v. Containment Technologies Corp., 96 F.3d 1372 (Fed. Cir. 1996). In a summary judgment proceeding, the patentee therefore is required to proffer evidence that the accused device contains every claim element either exactly or by a substantial equivalent. S. Bravo Systems, 96 F.3d at 1376. In this case, plaintiff relies on a theory of literal infringement to defeat summary judgment.[4] The claim elements at issue have been construed as "means-plus-function" claims.

### B. Summary Judgment of Literal Infringement

Literal infringement as to "means-plus-function" limitations under section 112, paragraph 6[5] "requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." Frank's Casing Crew & Rental Tools v. Weatherford Internat'l, Inc., 389 F.3d 1370, 1378 (Fed. Cir. 2004). "[E]quivalence (indeed, identity) of the 'function' of the assertedly substitute structure, material, or acts must be first established in order to reach the statutory equivalence analysis." Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999). Statutory equivalence analysis requires "a determination of whether the 'way' the assertedly substitute structure performs the claimed function, and the 'result' of that performance

---

[4] In other words, plaintiff does not rely on the doctrine of equivalents. See, e.g., Bims Decl. ¶ 81.

[5] Section 112, paragraph 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

is substantially different from the 'way' the claimed function is performed by the 'corresponding structure, acts, or materials described in the specification,' or its 'result.'" Id. Structural equivalence is met "if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." Id.; see also Frank's, 389 F.3d at 1378 (court "must compare the accused structure *with the disclosed structure*, and must find equivalent *structure* as well as *identity* of claimed *function* for the structure" (emphasis in original)).

While a claim limitation written in means-plus-function form, as with all claim limitations, must be "met, literally or equivalently, for infringement to lie," Odetics, 185 F.3d at 1268, "[t]he individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations." Id. Rather, the relevant claim limitation in a means-plus-function context "is the overall structure corresponding to the claimed function." Id. (noting, thus, that structures with different numbers of parts may still be equivalent under section 112, paragraph 6).

Where the nonmoving party's evidence "is such that no reasonable jury could determine two elements to be equivalent, district courts are obligated to grant partial or complete summary judgment." Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 39 n.8 (1997); Frank's, 389 F.3d at 1378.

1. Direct Infringement

Section 271(a) of the Patent Act provides that "whoever without authority makes, uses, offers to sell or sells any patented invention within the United States . . . infringes the patent." 35 U.S.C. § 271(a). "Making" is equivalent to "manufacturing." Bayer AG v. Housey Pharms., Inc., 340 F.3d 1367, 1372 (Fed. Cir. 2003). "Using" requires use of the complete invention, and encompasses "assembly" and "testing" of that invention. Waymark Corp. v. Porta Systems Corp., 245 F.3d 1364, 1366-67 (Fed. Cir. 2001); see also Waymark Corp. v. Porta Systems Corp., 334 F.3d 1358, 1361 (Fed. Cir. 2003) (noting prior decision's determination that

271(a) infringement requires "assembly, or a nearly complete testing assembly, within the United States"). "Selling" is defined with reference to its ordinary meaning, "includes the concept of a transfer of title or property," and "also requires as [a] third element 'a thing capable of being transferred.'" NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1319 (Fed. Cir. 2005). An "offer to sell" is determined "according to the norms of traditional contractual analysis," and requires no more than a commercial offer for sale." Rotec Industries, Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1254-55 (Fed. Cir. 2000).

### 2. Indirect (Contributory, Inducement) Infringement

Section 271(b) provides that "whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Section 271(c) provides further that

> [w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c).

Inducement and contributory infringement both are forms of indirect infringement. "[I]ndirect [patent] infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement." Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1272 (Fed. Cir. 2004); Epcon Gas Systems, Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1033 (Fed. Cir. 2002). Upon a failure of proof of direct infringement, any claim of inducement of infringement also fails. Epcon, 279 F.3d at 1033; C.R. Bard, Inc. v. Advanced Cardiovascular System, Inc., 911 F.2d 670, 673 (Fed. Cir. 1990).

/////

If an inducement claim is viable, to prove it a plaintiff "must prove that the defendant's actions induced infringing acts and that [they] know or should have known [their] actions would induce actual infringement." Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363 (Fed. Cir. 2003).

To survive a challenge to contributory infringement on summary judgment, a plaintiff must be able to demonstrate there is a genuine factual dispute as to whether the accused device has no "substantial, non-infringing uses." Golden Blount, Inc. v. Robert H. Peterson Co., 365 F.3d 1054, 1061 (Fed. Cir. 2004); Dynacore, 363 F.3d at 1277.

III. Analysis

    A. Literal Infringement of the Base Station Means Element (MedPoint System)

The crux of defendant's motion is that plaintiff is not able to demonstrate a genuine issue of material fact as to whether the accused MedPoint System contains the "base station means" claim element or its equivalent. Def't's Mem. P. & A. in Supp. Mot for Summ. J. (MSJ) at 5:23-9:2; Reply at 3:23-5:25.[6] Plaintiff's response, consisting of evidence regarding identicality of function as between the access points that are a part of the MedPoint System and

/////

/////

---

[6] Defendant's argument that its sale of only software provides grounds for summary judgment is addressed below in the analysis of direct infringement. See page 13 infra. Although defendant also raises questions about whether the MedPoint System as used by many of defendant's customers meets the "portable handheld patient terminal" claim limitation in claim 1, it does so in arguing for summary judgment of indirect infringement based on "substantial, noninfringing uses." MSJ at 10:4-25; Reply at 6:16-7:9. To the extent defendant's argument has implications for direct infringement, plaintiff proffers sufficient evidence to establish a factual dispute as to whether the MedPoint System, in certain iterations at least, incorporates a "handheld" device as construed by the court. See Norris Decl., Ex. PP ("Bridge Medical Handheld Demo" instruction sheet), Ex. G (customer's declaration regarding defendant's offering MedPoint System on wireless PDAs), Ex. WW (e-mails regarding handheld demo for potential customers); cf. id., Ex. FFF (defendant's response to interrogatory no. 8 stating only one customer – but a different customer than that signing the declaration filed as Exhibit G – "believed to have operated a handheld device in connection with MedPoint Software"). Plaintiff's expert also provides a detailed explanation, with support, of his opinion that every element of claim 1 is infringed by the MedPoint System. Bims Decl. ¶¶ 23-77.

the base stations in plaintiff's patented system, as well as equivalency of structure, is sufficient to raise a question of disputed fact as to whether the MedPoint System as a whole infringes.[7]

As noted, the "base station means" claim element, as a means-plus-function element, has been construed as performing the functions of "receipt of and transmission of the patient and item data" and "only allowing communication with a portable handheld patient terminal means having a corresponding program identifier." Order (filed June 7, 2005), Ex. A at A-3. Plaintiff satisfies the first step of literal infringement analysis of a means-plus-function claim element, for summary judgment purposes, by proffering its expert's explanation that the "access points" that communicate with mobile stations in the kind of 802.11 wireless network relied on by defendant incorporate transceivers for "receiving and transmitting wireless messages (data)," Bims Decl. ¶¶ 53, 56; see also id. ¶ 25 (access point sends information, including patient identification, to main computer), and "can only allow communication with mobile stations (portable terminals) that both have the access point's unique identifier and have been approved to communicate with the access point." Id. ¶ 57; Norris Decl., Ex. UU at 4-5 (defendant's "Best Practices" fact sheet indicating that "the network administrator should be able to configure [the] Access Point to only accept traffic from [assigned] devices."). Plaintiff's expert's explanation is sufficient to satisfy this step of analysis, given his expertise in the field of electrical engineering and his knowledge of and substantial practical experience working with 802.11 networks. Bims Decl. ¶¶ 3, 7-10.

Plaintiff also satisfies the second step of analysis, at the summary judgment stage, by putting forward a factual predicate from which the inference may be drawn that "the assertedly equivalent structure [in defendant's wireless context] performs the claimed function[s of the base station] in substantially the same way to achieve substantially the same result as the corresponding structure [of the base station] described in the specification." Odetics, 185 F.3d at

---

[7] Whether a disputed fact exists as to defendant's infringement, directly or indirectly, of plaintiff's patent is discussed below. See pages 13 to 17 infra.

...
...

1287; see also Frank's, 389 F.3d at 1378. In so doing, plaintiff properly focuses on "the overall structure corresponding to the claimed [base station] function[s]" relevant on this motion, Odetics, 185 F.3d at 1268, rather than on the individual components of the base station structure. Specifically, plaintiff's expert identifies the set of disclosed structural components that he opines performs the transmission of information and only allowing communication functions as "the location for inserting a portable terminal, circuitry for coding the portable terminal, dip switch and transceiver unit." Bims Decl. ¶¶ 61, 62. He identifies a corresponding set of structural components of the wireless structure relied on by defendant as equivalent structure: "access point memory, RF modem and antenna, and programmed microprocessor." Id. He further opines that the base station's receipt and transmission of data and only allowing communication functions "occur through substantially the same transfer of electromagnetic energy to/from the portable terminal," thus explaining his conclusion that defendant's "wireless structure performs exactly the same transfer of information as in the wired equivalent download using substantially the same way." Id. ¶ 60.[8] This explanation responds to and answers sufficiently, for now, plaintiff's suggestions that the absence of a single component – the "location for insertion" – in the access point configuration is fatal, cf. Odetics, 185 F.3d at 1268, and that defendant's reliance on a wireless system as opposed to a wired system also is enough for a grant of summary judgment.

---

[8] Defendant additionally argues that the access point does not perform the narrow "only allowing communication" function because it also performs a programming function by communicating with a client device that does not have a corresponding identifier, and that plaintiff attempts to read into the court's construction of "communication" an exclusion of transmissions of "programming" data. See Reply at 3:23 - 4:7. In initially construing "communication," this court understood that the parties agreed that the term, as used in the context of plaintiff's patent, did not include "transmission of information used to program portable handhelds with unique identifiers. . ."; thus the court understood there was no need to resolve a dispute regarding whether "communication" excluded transmission of programming data. See Findings & Recommendations (filed Nov. 9, 2004) at 35:8-12; cf. Transcript of Markman Hearing [docket nos. 313-314] at 2-202; Def't's Closing Argument in Supp. Claim Construction (filed July 30, 2004) at 21:20-22:3, 22:18-20. It does not appear defendant objected to the court's express articulation of its understanding in responding to the findings and recommendations, and the court declines to revisit the question in the absence of a timely-filed motion for reconsideration.

Plaintiff's expert bases his conclusions on his review of plaintiff's patent and documentary materials produced in discovery and otherwise identified, and his examination of hardware components and defendant's software. Id., ¶ 12 & Ex. B. His opinion thus is more than the kind of merely conclusory statement that is insufficient to establish the existence of a factual dispute as required here. Cf. On-Line Tech. v. Bodenseewerk Perkin-Elmer, 386 F.3d 1133, 1144 (Fed. Cir. 2004).

### B. Direct Infringement By Defendant

Defendant asserts that it develops and offers only software and therefore it cannot be liable for making, selling or offering to sell an accused device that contains each limitation of claim 1 of plaintiff's programmed hardware system, or its equivalent. MSJ at 4:14-23. Defendant points to documentary evidence that it has never offered to sell, in fact expressly disclaims any offer to sell, and has not made the complete invention claimed by plaintiff. Id. at 5:6-22. Defendant's argument that it cannot be liable for infringement based on "use" of plaintiff's invention is based on its position that the access points in the wireless systems in which its software is used do not infringe the base station claim element. Id. at 5:23-9:2. In light of the determination made above, that there is a factual dispute regarding whether the access point structures infringe the base station claim element, plaintiff's presentation of evidence supporting a conclusion that defendant makes direct use of the complete MedPoint System is sufficient to withstand summary judgment of direct infringement.

Plaintiff's evidence of use consists of discovery responses and deposition excerpts sufficient to support an inference that defendant has used the system in product development, testing and customer demonstrations. For example, plaintiff points to evidence of defendant's operation of the MedPoint System at its own facilities, where all of the hardware necessary to operate a complete system resides. Bims Decl. ¶¶ 78-79; Norris Decl., Exs. U, BB, RR, XX; cf. Waymark Corp., 245 F.3d at 1366-67 (assembly or a nearly complete testing assembly can qualify as 271(a) infringement). Plaintiff also points to evidence of defendant's demonstration of

the MedPoint System at at least one client facility.  Bims Decl. ¶ 79; Norris Decl., Exs. WW, XX.

### C. Indirect Infringement By Defendant

Because there is a factual dispute regarding direct infringement, the possibility of a viable dispute regarding indirect infringement is not automatically ruled out. Epcon, 279 F.3d at 1033; Bard, 911 F.2d at 673.  Here as well, plaintiff makes a showing sufficient to withstand summary judgment.

#### 1. Inducement

Plaintiff proffers evidence showing, and it is essentially undisputed, that defendant's customers use complete assemblies of the MedPoint System.  Norris Decl., Exs. C, D, M, V, XX.  Plaintiff also proffers evidence showing, and again it is essentially undisputed, that defendant sells the software that operates as part of the MedPoint System, and provides services related to the installation, operation and maintenance of the system. Id.  In light of this showing, and taking account of the above analyses of direct infringement through use of the MedPoint System, defendant's customers' mere use of the MedPoint System raises the possibility that a reasonable factfinder could find the customers to be infringing upon plaintiff's patent.

Plaintiff also proffers evidence giving rise to an inference that defendant's actions actually induce its customers' infringement, in the form of defendant's contracts covering sale of its software and services, which provide for services including "system setup," "application deployment" and "bar coding, and specify with particularity the array of hardware a customer must have or acquire in order for the MedPoint System to operate properly.  See, e.g., Norris Decl., Ex. D (Schedules 1 and 2 to License and Services Agreement); see also id. Exs. C, M, V.

Plaintiff's evidence that a reasonable factfinder could determine gives rise to an inference that defendant knew or should have known its actions would induce infringement takes the form of documents demonstrating defendant's knowledge of plaintiff's patent prior to at least

certain deployments of the MedPoint System, defendant's head-to-head competition with plaintiff, defendant's contracts that could be construed as engaging in too-careful line-drawing between defendant's provision of only software and services while precisely specifying hardware components to be purchased separately, and documents that could be used to impeach defendant as to whether its products and services are used with handheld devices, and if so to what extent. Id., Ex. G (knowledge of patent prior to a deployment); id., Ex. WW (e-mail suggesting close competition between defendant's and plaintiff's products); id., Exs. C, D, M, V (contracts); id., Ex. HHH (Declaration of Don Bauman ¶¶ 3, 4, stating that enjoining of defendant's marketing or use of the MedPoint software on "handheld or tablet PCs" "would cause [defendant] great hardship in the marketplace) compared with DF 38 (defendant's representation that "[m]ore than 95% of Bridge customers deploy MedPoint™ on a point of care device affixed to a cart or a stand," citing to interrogatory responses filed as Exhibit M to the Declaration of Jose L. Patiño). Cf. Warner-Lambert Co., 316 F.3d at 1363 ("circumstantial evidence may suffice" to prove intent); Insituform Technologies, Inc. v. CAT Contracting, Inc., 385 F.3d 1360 (Fed. Cir. 2004) ("Intent is a factual determination particularly within the province of the trier of fact and may be inferred from all of the circumstances.").

### 2. Contributory Infringement

Defendant's remaining argument is that it cannot be liable for contributory infringement because plaintiff cannot show there are substantial non-infringing uses of its MedPoint software, in that the software is used by many if not most of its customers in connection with patient terminals that are mounted on a cart and not "held in the hand or hands." MSJ at 10:4-25; Reply at 6:16-7:9.[9] Plaintiff proffers evidence in response that defendant

---

[9] Plaintiff's patent includes one claim element, namely a "portable handheld patient terminal," that has been construed as "a microprocessor controlled portable patient terminal that is used or operated while held in the hand or hands." Order (filed June 7, 2005), Ex. A at A-2. Defendant's introduction of the handheld element in the context of noninfringing uses, without having relied on it for summary judgment of infringement, is curious. In any case, plaintiff proffers evidence sufficient to demonstrate a factual dispute as to whether the MedPoint System

depends on offering its MedPoint software for use in connection with handheld devices, and that the cart-mounted devices are not necessarily not handheld.

The language of the contributory infringement statute "deals with the material actually sold by the accused and the uses made of it by its purchasers." Hodosh v. Block Drug Co., 833 F.2d 1575, 1578 (Fed. Cir. 1987). The "substantial, non-infringing use" defense to contributory infringement requires "a qualitatively significant noninfringing use . . . before a defendant can be fully absolved from contributory infringement liability. . . . Whether a use is 'substantial' or not depends on how likely and often the use will occur." Hoffmann-La Roche, Inc. v. Promega Corp., 33 U.S.P.Q.2d 1641, 1648 (Fed. Cir. 1994). This element additionally requires that the item sold not be as a "staple article or commodity of commerce" suitable for such use. See 35 U.S.C. 271(c). A "staple" article of commerce "is one that was not specifically designed for use with a patented process [or combination] and has substantial, efficient, and feasible uses outside of the patent. If the practice of the patented method [or combination] is incidental and necessary to the practice of the unpatented methods, the device is a staple and there can be no contributory infringement." 4 Patent Law Fundamentals § 20:7 (citing Polysius Corp. v. Fuller Co., 709 F. Supp. 560, 576 (E.D. Pa. 1989) and Oak Indus., Inc. v. Zenith Electronics Corp., 726 F. Supp. 1525, 1538 (N.D. Ill. 1989)).

In light of the determination of direct infringement above, plaintiff's showing that the MedPoint software is used specifically and only in the MedPoint System is sufficient to rebut defendant's argument that its software is a staple and subject to qualitatively significant noninfringing uses. See, e.g., Norris Decl., Ex. D ("Order" including description of software as "the Bridge MedPoint™ bar code - enabled point of care system ("MedPoint") and the Center Interface Package"). Additionally, as plaintiff points out, defendant's declaration offered in opposition to preliminary injunctive relief, which stated that an injunction directed at handheld

---

contains a component that infringes the "portable handheld patient terminal" claim element. See Bims Decl. ¶¶ 39-43.

1  devices "would cause [defendant] great hardship," Norris Decl., Ex. HHH (Bauman declaration)
2  could be perceived by a reasonable trier of fact as contradicting defendant's representation now
3  that virtually all of its customers use non-handheld devices, Patiño Decl., Ex. M.  Cf. Bard, 911
4  F.2d at 674 & n.2 (evidence regarding percentages of use types not contradicted in record); see
5  also Norris Decl., Ex. PP ("Bridge Medical Handheld Demo" instruction sheet), Ex. G
6  (customer's declaration regarding defendant's offering MedPoint System on wireless PDAs), Ex.
7  WW (e-mails regarding handheld demo for potential customers); cf. id., Ex. FFF (defendant's
8  response to interrogatory no. 8 stating only one customer – but a different customer than signed
9  Exhibit G – "believed to have operated a handheld device in connection with MedPoint
10 Software").

IV. Conclusion

For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendant's motion for summary judgment of infringement be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 23, 2005.

_____
UNITED STATES MAGISTRATE JUDGE

mckesson-infringe.f&rs