UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

McKESSON INFORMATION
SOLUTIONS, INC.,

NO. CIV. S-02-2669 FCD KJM

        Plaintiff,

   v.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

BRIDGE MEDICAL, INC.,

       Defendant.

----oo0oo----

On December 13, 2002, plaintiff and counter-defendant McKesson Information Solutions, Inc. ("McKesson") filed a patent infringement suit against defendant and counter-plaintiff Bridge Medical, Inc. ("Bridge") based on U.S. Patent No. 4,857,716 ("the '716 patent"), entitled "Patient Identification and Verification System and Method." By way of affirmative defense and counter-complaint for declaratory judgment, Bridge asserted that the '716 patent is unenforceable due to inequitable conduct.

1    At the parties' request, the court bifurcated trial of this
2    case into two phases:  Phase I, a bench trial on Bridge's
3    affirmative defense of inequitable conduct, and Phase II (if
4    Bridge did not prevail), a jury trial on McKesson's infringement
5    claim in which the court would concurrently decide Bridge's other
6    equitable defenses of equitable estoppel and unclean hands.  (Am.
7    Pretrial Conf. Order, filed Mar. 23, 2006, § II.)

8    The Phase I bench trial on the issue of inequitable conduct
9    took place on May 2, 3, 4, and 9, 2006.  Considering the evidence
10   presented therein and the parties' written submissions
11   thereafter,[1] the court enters the following findings of fact and
12   conclusions of law pursuant to Federal Rule of Civil Procedure
13   52(a).  The court finds that inequitable conduct occurred during
14   prosecution of the '716 patent and accordingly, enters judgment
15   declaring the patent unenforceable for that reason.  The Phase II
16   jury trial of this matter, and any pending motions related
17   thereto, are therefore vacated.

18                      **FINDINGS OF FACT**

19       **A.   Time-line of Events**

20       1.   Attorney Michael D. Schumann ("Mr. Schumann")
21   prosecuted the patent application that ultimately issued as the
22   '716 patent, in addition to several copending applications for
23   the same client, CliniCom, Inc., McKesson's predecessor-in-

24   _____

25       [1]   The parties filed proposed Findings of Fact and
     Conclusions of Law on May 16, 2006.  In some respects herein the
26   court has adopted, without attribution, language suggested by one
     side or the other.  In all such instances, the finding of fact or
27   conclusion of law has become the court's own, based upon its
     review of the evidence and the law.  To the extent that any of
28   the court's findings of fact may be considered conclusions of law
     or vice versa, they are to be considered as such.

interest to the '716 patent.  (Undisputed Facts, Am. Pretrial

Conf. Order, filed Mar. 23, 2006, [hereinafter, "Undisputed

Facts"], at 4:15-25.)  Mr. Schumann, an experienced patent

prosecution attorney, is currently a name partner in a patent law

firm in Minneapolis, MN.  (TT 30:5-8.)[2]  Previously, Mr. Schumann

spent 24 years with another patent law firm in Minneapolis,

during which time he prosecuted the '716 patent at issue in this

case.  (TT 30:8-11.)

2.   On July 19, 1985, Mr. Schumann filed the original

grandparent application ("the '277 application") that would

ultimately mature into the '716 patent.  (TT 82:7-83:3.)  That

application was assigned for review to Examiner David Trafton at

the United States Patent & Trademark Office (the "PTO"), and

identifies Peter Gombrich, Ronald Zook and Max Hendrickson as the

inventors.  (TX B-00001.)  The '277 application is also the

grandparent application for CliniCom, Inc.'s copending U.S.

Patent No. 4,835,372, bearing the title "Patient Care System"

("the '372 patent").  (TX Q-00001.)

3.   On May 12, 1986, Mr. Schumann filed the parent

application ("the '278 application") that later issued as the

'716 patent. (TT 49:21-24.)  That application in the chain of

the '716 patent remained before Examiner Trafton.  (TX B-00001.)

The '278 application is also the parent application for the

copending '372 patent, which was also before Examiner Trafton.

(TX Q-00001.)

---

[2]    All citations to "TT ___" are to the Trial Transcript
of the bench trial.  All citations *infra* to "TX ___" are to the
exhibits admitted into evidence during the trial.

4.   The same day Mr. Schumann filed the parent application for the '716 patent, he also filed another application, the '149 application, for CliniCom, Inc. which later issued as U.S. Patent No. 4,850,009 ("the '009 patent").  (TX R-00001.)  That application was assigned for review to PTO Examiner Robert Lev.  (Id.)

5.   In the first Information Disclosure Statement ("IDS") in the '009 prosecution, filed on August 12, 1986, Mr. Schumann informed Examiner Lev of the existence of the copending '716 application.  (TT 94:21-95:19; TX X-00129.)  Mr. Schumann also disclosed the '009 application to Examiner Trafton in the '716 case on August 14, 1986.  (Undisputed Facts at 5:19-25.)

6.   On February 26, 1987, Examiner Lev issued an Office Action in the '009 prosecution, rejecting every claim of the application as obvious over the prior art.  (TX X-00042-46.)

7.   In a supplemental IDS, of March 20, 1987, while disclosing additional prior art references, Mr. Schumann notified Examiner Trafton again of the copending application that issued as the '009 patent.  (TX W-00105.)

8.   Through March of 1987, Mr. Schumann had disclosed identical prior art to Examiner Trafton and Examiner Lev--the same 33 patents and five articles--in the copending '716 and '009 prosecutions.  (TT 105:1-10.)

9.   On April 6, 1987, Examiner Trafton rejected every claim in the '716 application as obvious in light of the prior art.  (TT 110:11-17; TX W-00111.)

10.   On October 6, 1987, Mr. Schumann filed an "Amendment under Rule 111" in the '716 prosecution.  (TX W-00115-125.)  In

4

the amendment, Mr. Schumann made arguments in response to Examiner Trafton's rejections.  Specifically, he distinguished the prior art, and in particular argued:

> None of the references either singularly or in combination teach or suggest the claimed invention. In addition to numerous other differences, none of the references teach the three node approach to communications as provided in the claimed invention. In the present invention, the first node of communication is a main or central computer . . . The second node of communication are the base stations which are wired to the main computer. . . . The third node of communication in the present invention is the portable handheld patient terminal which cooperates with the base stations to provide for wireless transmission of data between the base station and the patient terminal.

(TX W-00124.)

11.  In the amendment, Mr. Schumann also notified Examiner Trafton of a new copending application that he filed (TX W-00125), the '195 application, which was a continuation-in-part of the '278 application and eventually issued as the '372 patent. (TX Q.)

12.  On October 23, 1987, Mr. Schumann participated in a telephonic interview with Examiner Lev in the copending '009 prosecution.  (TX X-00062.)  Throughout the entire prosecution of both the '716 and '009 patents, the October 23, 1987 interview with Examiner Lev was the only telephonic interview. (TT 117:21-118:5.)  During that interview, Examiner Lev raised one piece of prior art, U.S. Patent No. 4,456,793 to Baker et al. ("the Baker patent"), which had not previously been disclosed in either the '009 or '716 proceedings.  (TX X-00062; TT 119:17-120:2.)  Examiner Lev suggested that claims 1s9-24 of the pending '009 application be cancelled in light of the Baker

patent.  (TT 120:9-18; TX X-000062.)

13.  On December 1, 1987, Examiner Lev issued another rejection in the '009 prosecution, again rejecting every claim as obvious.  (TX X-00064-68.)  In particular, he rejected certain claims--claims 20 and 22-24--as obvious in light of the Baker patent in combination with other prior art.  (TX X-00066-67.)

14.  On December 8, 1987, Examiner Trafton again rejected the majority of the claims pending in the '278 application (the '716 patent), but found that two of the pending claims would be allowable if rewritten as independent claims.  (TX W-00129.)  In response to the examiner's action, Mr. Schumann filed a continuation application on June 8, 1988, the '527 application, and abandoned the '278 application.  (TX W-00133.)  In a Preliminary Amendment in the '527 application, Mr. Schumann amended the allowable claims in accordance with the examiner's previous comments and cancelled the remaining rejected claims.  (TX W-00135-138.)  But Mr. Schumann also informed the examiner that he reserved the right to pursue the other rejected claims of the '278 application in the copending '195 application, which eventually issued as the '372 patent, thus notifying the examiner for the second time of that copending application.  (<u>Id.</u> at W-00137.)

15.  On June 17, 1988, in response to Examiner Lev's December 1, 1987 rejections, Mr. Schumann filed a Preliminary Amendment in the '009 prosecution and cancelled claims 19-24, "in an effort to obtain early allowance of at least some claims to the invention."  (TX X-00077.)

16.  Mr. Schumann did not inform Examiner Trafton in the '716 prosecution of either of Examiner Lev's rejections in the '009 prosecution, or of the Baker patent.  (TT 110:5-8; 121:10-13; 126:22-127:3.)

17.  On September 19, 1988, Mr. Schumann filed another patent application for CliniCom, Inc. which ultimately issued as U.S. Patent No. 4,916,441, "Portable Handheld Terminal" ("the '441 patent").  (TX T-00001.)  That application was assigned to Examiner Donald Yusko at the PTO.  (Id.)  While the copending '716 patent application continued to be under review by Examiner Trafton, Mr. Schumann disclosed the Baker patent to Examiner Yusko in the first IDS in the '441 prosecution.  (TX Y-00079.)

18.  On December 16, 1988, the Notice of Allowability regarding the '372 patent was mailed to Mr. Schumann. (TX H-13-00066.)  The '372 patent assigned to CliniCom, Inc. issued on May 30, 1989 and lists as inventors Peter Gombrich, Richard Beard, Richard Griffee, Thomas Wilson, Ronald Zook and Max Hendrickson.  (TX Q-00001.)  Claim 1 of the '372 patent claims a "patient identification and verification system for relating items to specific patients and for ensuring that an identified item corresponds to an identified patient," comprised of three nodes of communication: (1) "programmed system computer means," (2) "microprocessor controlled portable handheld patient terminal means," and (3) "microprocessor controlled base station means including electromagnetic wave transceiver means." (TX Q-00051-52.)

19.   The PTO issued the '009 patent on July 18, 1989. (TX R-00001.)   The '009 patent, titled "Portable Handheld Terminal Including Optical Bar Code Reader And Electromagnetic Transceiver Means For Interactive Wireless Communication With A Base Station," is assigned to CliniCom, Inc. and lists as inventors Ronald Zook and Peter Gombrich.   (TX R-00001.)   The '009 patent claims, *inter alia*, a "portable handheld terminal" including keyboard means, display means, optical sensor means for sensing bar code indicia, and electromagnetic transceiver means. (TX R-00014 at claim 16, lines 37-59.)   The patent further claims "a system" in which the "base station means" includes "programmed microprocessor and memory means for controlling communication between the portable handheld terminal and a central computer system electrically wired to the base station means." (TX R-00015 at Claim 16.)

20.   On August 15, 1989, the '716 patent was issued by the PTO.   (TX B-00001.)   Claim 1 of the '716 patent claims a "patient identification and verification system" comprising three nodes of communication: (1) "programmed system computer means," (2) "microprocessor controlled portable handheld patient terminal means," and (3) "microprocessor controlled base station means including electromagnetic wave transceiver means."   (TX B-00036.) The portable handheld patient terminal means further includes bar code reader means, keyboard means, display means, and electromagnetic wave transceiver means.   (TX B-00036 at 30:42-58.)   Claim 1 of the '716 patent also specifies that the base station is "interconnected to the programmed system computer means at least in part by electrical lines."

(TX B-00036 at 30:65-67.)

**B.   The Baker Patent**

21.   Examiner Lev rejected claims 20 and 22-24 in the '009 application because of the Baker patent.  (TX X-00066-67.)[3] Rejected Claim 20 involved a portable handheld terminal with a "unique address signal," and rejected claims 22-24 involved methods of transmitting patient information from a handheld to a base station using a "unique address recognizable by a base station programmed to accept patient related information containing the unique address."  (TX X-00056-57.)  Examiner Lev found that Baker rendered the address code in the portable handheld obvious.  (TX X-00066-67.)  Mr. Schumann testified that the limitations Examiner Lev rejected were also present in the '716 application he was prosecuting concurrently. (TT 128:25-129:13.)

22.   Additionally, the Baker patent includes the very features relied upon by Mr. Schumann to argue for patentability of the '716 patent.  (TX W-000124.)  The parties did not dispute that Baker teaches a three-node approach to communications similar to that claimed in the '716 patent; the three nodes are plainly depicted in the Baker patent's Figure 1. (TX AA-00002.)  Bridge's expert Dr. Lawrence Fagan ("Dr. Fagan") explained that the first node in the Baker patent is the "central

---

[3]     The reference in the December 1, 1987 Office Action to "Claim 26" (TX X-00066 at ¶ 5) is a typographical error, as there was no Claim 26 pending. In light of the otherwise sequential treatment of claims by Examiner Lev, the court finds that the rejection at issue applies to pending Claim 20, as patent law expert James Sheridan ("Mr. Sheridan") testified. (TT 345:25-346:11.)

controller" in that figure, the second node is the "subsystem
controller," and the third node is the handheld device, depicted
as a cordless phone.  (TT 264:5-265:22.)  McKesson's expert Dr.
Harry Bims ("Dr. Bims") agreed that the Baker patent discloses a
three-node system, where the central controller is the first
node, the subsystem controller is the second node, and the
handheld device is the third node.  (TT 446:1-18.)

23.  Mr. Schumann cited as relevant prior art at least five
cordless telephone references to the '716 Examiner.  (TX W-00105-
107.)  The Baker patent also related to a cordless telephone
system.  (TT 246:24-247:1.)  Mr. Schumann also cited among the 33
prior art patents disclosed to both the '716 and '009 Examiners
patents relating to "monitoring test animal activity," a
"security system," and a "theft detection system."  (TX V-00069-
70; TX W-00095-96.)  None of these patents related to patient
identification systems, yet Mr. Schumann disclosed them "in
accordance with the applicant's duty of good faith and candor
toward the Patent Office."  (TX W-00093; TX V-00068.)  Mr.
Schumann testified that patents can be material where there is "a
different application even though the underlying technology might
be relevant to the case that you're handling."  (TT 89:24-90:1.)

24.  Examiner Lev had both U.S. Patent 4,628,193 to Blum
(the "Blum patent") and U.S. Patent 4,593,155 to Hawkins (the
"Hawkins patent") before him (TX X-00130) but used the Baker
patent to reject the '009 patent's claims to a portable handheld
terminal, as discussed above.

25.  The Baker patent more explicitly and clearly discloses
a three-node wireless communications system than either the Blum

or Hawkins patents.  The Blum patent (TX CC) does not disclose a
three-node system at all; it discloses a two node system with a
handheld and a central computer, where the handheld is physically
docked in the computer to transmit information.  (TT 271:19-
272:25.)  There is no base station that wirelessly transmits data
from the handheld to the central computer.  (<u>Id.</u>)  The Hawkins
patent (TX U9) only implicitly suggests a third node, a central
computer, rather than expressly disclosing it, like the Baker
patent.  (TT 270:14-271:18.)  Also, the parties' experts agreed
that the Baker patent includes the "display" claim limitation of
the '716 patent, which is missing from Hawkins.  (TT 270:9-13;
451:6-18.)

    26.  Mr. Schumann admits that he knew that his duty to
disclose material information in the '716 prosecution continued
until that patent issued on August 15, 1989.  (TT 50:23-51:2.)
After learning of the Baker patent on October 23, 1987 from
Examiner Lev, Mr. Schumann continued to actively prosecute the
'716 patent for another 22 months until his admitted duty of
disclosure expired.  (<u>See</u> TT 127:6-16.)

    27.  Mr. Schumann cancelled the claims in the '009
application that were rejected due to the Baker patent.
(TT 131:8-132:1; TX X-00077.)  Features of those cancelled claims
included aspects of the invention under review in the '716 patent
prosecution.  (TT 128:25-129:13.)

    28.  Mr. Schumann has no present recollection of prosecuting
the '716 patent and thus cannot describe why, at the time, he did
not disclose the Baker patent to the '716 Examiner.  (TT 212:2-5;
218:2-6; 222:1-22.)  He believes *now*, looking at the Baker

patent, that it is cumulative prior art.   (TT 221:17-21.)

C.   **The Rejections in the '009 Prosecution**

29.   The rejected '009 claims were substantially similar to the '716's Claim 1.   In the first rejection issued by Examiner Lev on February 26, 1987, he rejected then-pending '009 claims 15 and 16.   Claim 15 claimed:

> A portable handheld terminal system, comprising:
>
> (a) a portable handheld terminal, including:
>
> > (i) a housing having first and second spaced apart, opposing major surfaces extending longitudinally of the housing between first and second end portions;
> >
> > (ii) keyboard means disposed on the first surface for entering data;
> >
> > (iii) display means disposed on the first surface for displaying data;
> >
> > (iv) optical sensor means disposed in the housing for sensing bar code indicia;
> >
> > (v) RF transceiver means contained in the housing for transmitting and receiving RF signals;
> >
> > (vi) control means contained in the housing and operatively interconnected to the keyboard means, display means, optical sensor means, and RF transceiver means for controlling operation of the portable handheld terminal; and
> >
> > (vii) power supply means for powering the portable handheld terminal; and
>
> (b) base station means including RF transceiver means for communication with the portable handheld terminal.

(TX X-00117-118.)   This claim alone bears striking resemblance to Claim 1 of the '716 patent.   Like the rejected '009 claim, Claim 1 of the '716 patent claims a "portable handheld patient terminal means" having "bar code reader means," "keyboard means" and "display means," "electromagnetic wave transceiver means,"

12

1   and "base station means" that transmit data wirelessly

2   to the handheld terminal.  (TX B-00036 at col. 30:42-64.)

3   Rejected claim 16 in the '009 application strengthens the

4   similarity, adding a "central computer system electrically wired

5   to the base station means" (TX X-00118), the final node of the

6   '716 patent's three-node system.  (See TX B-00036 at col.

7   30:65-67 ["the base station means being interconnected to the

8   programmed system computer means at least in part by electrical

9   lines . . ."].)  In sum, these two rejected claims substantially

10  overlap with the limitations of Claim 1 of the '716 patent.  Also

11  notable, these two '009 claims disclose all three nodes of the

12  '716's patient identification system, with the identical means of

13  communication among the core structures: the portable

14  handheld terminal, communicating wirelessly with base stations,

15  which in turn, communicate by electrical lines with a central

16  computer.

17       30.  The second rejection issued by Examiner Lev on December

18  1, 1987, again rejected '009 claims which were substantially

19  similar to the '716's Claim 1.  There, Examiner Lev rejected '009

20  pending claims 19 and 21, which like Claim 1 in the '716 patent,

21  included a "handheld terminal" with "keyboard means," "display

22  means," "optical sensor means . . . for sensing bar code data,"

23  "electromagnetic transceiver means for transmitting and receiving

24  electromagnetic signals representing the exchange of data,"

25  transmitting wirelessly "to a base station patient related

26  information" which, in turn, transmits that "patient related

27  information . . . to the central computer location by" electrical

28  lines.  (TX X-00055-57.)  Moreover, in the second rejection,

13

Examiner Lev also rejected the newly-added limitation of a
"unique address recognizable by a base station programmed to
accept patient related information containing the unique
address."  (TX X-00057 [rejected '009 claims 22 and 23].)  This
limitation appears in the '716 patent as the "programmable unique
identifier" aspect of the base station means.  (TX B-00037.)

    31.  Several other '716 claim elements were also present in
the rejected '009 claims; namely, a "bar reader," a "programmable
identification code" and "the transmission of patient data."
(TT 656:4-9.)  Rejected claim 15 included "optical sensor
means disposed on the housing for sensing bar code indicia,"
(TX X-00117), which Mr. Schumann testified is "basically the same
thing" as the bar code reader in the '716 claims.  (TT 76:2-7.)
Rejected claims 22 and 23 include a "unique address," and further
specify that the base station is "programmed" with that address.
(TX X-00057 ["transmission of a unique address recognizable by a
base station programmed to accept patient related information
containing the unique address . . . the step of programming with
the base station, the portable handheld terminal to transmit the
unique address"].)  Finally, rejected claim 22 explicitly
discloses "transmitting patient related information to the base
station from the handheld."  (TX X-00057.)

    32.  Mr. Schumann has no present recollection of prosecuting
the '716 patent and thus cannot describe why, at the time, he did
not disclose the '009 rejections to the '716 Examiner.  Looking
back, Mr. Schumann believes *now* that he either (1) probably
believed activity in the '009 prosecution was immaterial to the
'716 prosecution because the '009 case involved only a terminal,

while the '716 case involved an entire "system" or (2) he was
simply following his former law firm's policy and practice of not
disclosing rejections in copending applications, even where the
rejections related to other substantially similar, pending
claims.  (See TT 239:18-240:4; 155:21-156:20; 41:11-19; 229:5-
21.)

D.   **Allowance of the '372 Patent**

33.   The allowed '372 claims were substantially similar to
the '716 claims.  As an initial matter, the two patents share the
same assignee, three of the same inventors, 35 identical
figures and identical specifications.  (TT 238:18-20;
63:12-64:13; 65:4-67:20; compare TX B ['716 patent] with TX Q
['372 patent].)  Moreover, the claims of the two patents are
nearly identical.  Both patents claim a "patient identification
and verification system" comprising (1) "programmed system
computer means for processing and storing patient data," (2) a
"microprocessor controlled portable handheld patient terminal
means" that further includes "barcode reader means," "display
means," and "keyboard means," and (3) "microprocessor controlled
base station means" which is wired to the programmed system
computer means and which includes "electromagnetic wave
transceiver means" for communication with the portable handheld.
(TX B-00036 and TX Q-00051-52.)

34.   The only significant variation between the '372 and
'716 patents is that the "base station means" in the '716 patent
includes a "programmable unique identifier" and "means for only
allowing communication with a portable handheld patient terminal
means having a corresponding program identifier," elements not

15

1  present in the '372 claims.  (TX B-00037 at col. 31:2-11.)

2  **CONCLUSIONS OF LAW**

3  **A.   Legal Standard**

4      35.  Stated generally, patent applicants and their patent

5  attorneys have a duty of candor, good faith and honesty in their

6  dealings with the PTO.  37 C.F.R. § 1.56(a) (1989).  The duty of

7  candor, good faith and honesty includes the duty to submit

8  truthful information and the duty to disclose to the PTO

9  information known to the patent applicants or their attorneys

10 which is material to the examination of the patent application.

11 Elk Corp. of Dallas v. GAF Bldg. Materials Corp., 168 F.3d 28, 30

12 (Fed. Cir. 1999); 37 C.F.R. § 1.56(a) (1989).  The duty of candor

13 extends throughout the patent's entire prosecution history.  Fox

14 Industries v. Structural Preservation Systems, Inc., 922 F.2d

15 801, 803 (Fed. Cir. 1991).

16     36.  Breach of the duty of candor, good faith and honesty

17 may constitute inequitable conduct.  Id.  If it is established

18 that a patent applicant engaged in inequitable conduct before the

19 PTO, the entire patent application so procured is rendered

20 unenforceable.  Kingsdown Medical Consultants, Ltd. v. Hollister

21 Inc., 863 F.2d 867, 877 (Fed. Cir. 1988).

22     37.  To establish inequitable conduct due to the failure to

23 disclose material information or the submission of false

24 information, the party raising the issue must prove by clear and

25 convincing evidence[4] that (1) the information is material; (2)

26

27        [4]   The clear and convincing standard of proof of facts is
   an intermediate standard which lies somewhere between "beyond a
28                                              (continued...)

16

the knowledge of this information and its materiality is chargeable to the patent applicant; and (3) the applicant's submission of false information or its failure to disclose this information resulted from an intent to mislead the PTO.  Id.

38.  Information is deemed material if there is a substantial likelihood that a reasonable examiner would have considered the material important in deciding whether to issue the application as a patent.  See Elk Corp., 168 F.3d at 31; 37 C.F.R. § 1.56(a).  Accordingly, a reference does not have to be prior art to be material information that must be disclosed to the PTO.  See 37 C.F.R. § 1.56(a) (1989).  "The [information] need only be within a reasonable examiner's realm of consideration."  Merck & Co., Inc. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1421 (Fed. Cir. 1989).

39.  Disclosure is required where the materiality of the information is in doubt because "[c]lose cases should be resolved by disclosure, not unilaterally by the applicant."  LaBounty Mfg., Inc. v. United States Int'l Trade Comm., 958 F.2d 1066, 1076 (Fed. Cir. 1992).

40.  "[A]n otherwise material reference need not be disclosed if it is merely cumulative of or less material than other references already disclosed."  Elk Corp., 168 F.3d at 31.

41.  Intent to deceive is rarely established by direct evidence, and therefore, may be inferred from the facts and

---

⁴(...continued)
reasonable doubt" and a "preponderance of the evidence."
Addington v. Texas, 441 U.S. 418, 425 (1979).  Clear and convincing evidence requires proof that a contention is "highly probable."  Colorado v. New Mexico, 467 U.S. 310, 316 (1984).

circumstances surrounding the applicant's overall conduct.
Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180 (Fed. Cir. 1995)
(intent to deceive is most often proven "by a showing of acts,
the most natural consequence of which are presumably intended by
the actor").  For example, "intent may be inferred where a patent
applicant knew, or should have known, that withheld information
would be material to the PTO's consideration of the patent
application."  Critikon, Inc. v. Becton Dickinson Vascular
Access, Inc., 120 F.3d 1253, 1256 (Fed. Cir. 1997).  In
determining whether the applicant's overall conduct evidences an
intent to deceive the PTO, the Federal Circuit has emphasized
that "the involved conduct, viewed in light of all the evidence,
including evidence indicative of good faith, must indicate
sufficient culpability to require a finding of intent to
deceive."  Paragon Podiatry Laboratory, Inc. v. KLM Laboratories,
Inc., 984 F.2d 1182, 1189 (Fed. Cir. 1993) (internal quotations
and citation omitted).

42.  While "materiality does not presume intent, which is a
separate and essential component of inequitable conduct," Allen
Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1352 (Fed.
Cir. 2002) (internal quotation marks and citation omitted), the
materiality of a reference may lead to an inference of intent.
Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., 394 F.3d
1348 (Fed. Cir. 2005) ("in the absence of a credible explanation,
intent to deceive is generally inferred from the facts and
circumstances surrounding a knowing failure to disclose material
information").  "Intent to deceive, however, cannot be 'inferred
solely from the fact that information was not disclosed;' there

1  must be a factual basis for a finding of deceptive intent."

2  <u>Purdue Pharma L.P. v. Endo Pharm.</u>, 438 F.3d 1123, 1133-34 (Fed.

3  Cir. 2006).

4      43.  Moreover, if the failure to disclose or

5  misrepresentation occurred due to "[s]imple negligence,

6  oversight, or an erroneous judgment made in good faith," the

7  intent element is not satisfied.  <u>See</u> <u>Speciality Composites v.</u>

8  <u>Cabot Corp.</u>, 845 F.2d 981, 982 (Fed. Cir. 1988).  A finding of

9  "gross negligence," likewise, "does not itself justify an

10  inference of intent to deceive."  <u>Kingsdown</u>, 863 F.2d at 876.

11  However, a patent applicant cannot "cultivate ignorance, or

12  disregard numerous warnings that material information or prior

13  art may exist, merely to avoid actual knowledge of that

14  information or prior art."  <u>FMC Corp. v. Hennessy Industries,</u>

15  <u>Inc.</u>, 836 F.2d 521, 526 n.6 (Fed. Cir. 1987).

16      44.  Once materiality and intent have been established, the

17  court must conduct a balancing test to determine "whether the

18  scales tilt to a conclusion that 'inequitable conduct' occurred."

19  <u>Critikon</u>, 120 F.3d at 1256.  Generally, "when the

20  misrepresentation or withheld information is highly material, a

21  lesser quantum of proof is needed to establish the requisite

22  intent, . . . In contrast, the less material the information, the

23  greater the proof must be."  <u>Purdue Pharma L.P.</u>, 438 F.3d at

24  1128-29 (internal citations omitted).

25      45.  Ultimately, the question of whether inequitable conduct

26  occurred is equitable in nature.  The court must make the

27  "equitable judgment concerning whether the applicant's conduct is

28  so culpable that the patent should not be enforced."  <u>Life</u>

1  Techns., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1324 (Fed.

2  Cir. 2000).  During this step of the analysis, the court

3  determines "whether the material misrepresentations or omissions

4  in question are sufficiently serious in light of the evidence of

5  intent to deceive, under all the circumstances, to warrant the

6  severe sanction of holding the patent unenforceable."  Hoffman-La

7  Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1372 (Fed. Cir.

8  2003).

9       **B.    The Subject Conduct in the '716 Patent Prosecution**

10      46.   Having considered the evidence presented at trial, and

11 the law governing the factual determinations of materiality and

12 intent, the court finds that Bridge has proven materiality and

13 intent by clear and convincing evidence with respect to three

14 categories of information Mr. Schumann withheld from Examiner

15 Trafton during the '716 patent's prosecution: (1) the Baker

16 patent, (2) the rejections by Examiner Lev in the

17 '009 prosecution, and (3) the allowance of the '372 patent.

18           **1.    Nondisclosure of the Baker Patent**

19                **a.    Materiality**

20      47.   An examiner's reliance on a prior art reference in a

21 related prosecution supports a finding of materiality.  See

22 Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180 (Fed. Cir. 1995)

23 (affirming holding of materiality where one set of patent

24 examiners considered a prior art reference material).  Similarly,

25 here, Examiner Lev in the copending '009 prosecution brought the

26 Baker patent to Mr. Schumann's attention during a telephonic

27 interview and recommended that claims 19-24 of that application

28 be cancelled in light of the Baker patent.  (TX X-00062.)  Up

20

1  until that interview, Mr. Schumann had cited the same 38 prior

2  art references in the '716 and '009 prosecutions.  (TT 105:1-10.)

3      48.  Indeed, Mr. Schumann testified that Examiner Lev's

4  reliance on the Baker patent supports a finding of materiality:

> Q. My question to you is: If the examiner in the primary
> copending application had the exact same prior art in front
> of him and the examiner in the co-pending application used
> an additional piece of prior art to reject claims that were
> substantially similar, that piece of prior art would be
> material and should be cited back to the primary
> application, shouldn't it?
>
> A. If the same art had been before the examiners and the
> claims are substantially similar, probably a pretty good
> indication that the reference would be pretty material, yes.

11 (TT 58:4-13.)

12     49.  Moreover, Examiner Lev not only brought the Baker

13 patent to Mr. Schumann's attention, he ultimately rejected claims

14 20 and 22-24 in the '009 prosecution because of Baker.  (TX X-

15 00066-67.)  Specifically, rejected Claim 20 involved a portable

16 handheld terminal with a "unique address signal," and rejected

17 claims 22-24 involved methods of transmitting patient information

18 from a handheld to a base station using a "unique address

19 recognizable by a base station programmed to accept patient

20 related information containing the unique address."  (TX X-00056-

21 57.)  Examiner Lev found that the Baker patent rendered the

22 address code in the portable handheld obvious.  (TX X-00066-67.)

23     50.  In his testimony, Mr. Schumann confirmed that the

24 limitations Examiner Lev rejected were also present in the '716

25 application he was prosecuting concurrently:

> Q. The unique address code existed in both claims, the
> claims in both patents; right?

1    A. Was an element in some of the claims, yes.

2    Q. Examiner Lev found that Baker rendered that obvious,
     the address code?

3

4    A. He found that our claims to a portable handheld
     terminal were not allowable in view of the Baker
     reference for those specific claims, not the others.

5

6    Q. You had a portable handheld terminal as part of the
     716 claim; right?

7    A. Yes. A portable handheld terminal as part of the 716
     claims.

8

9    Q. You had a unique address as part of the 716 claims?

10   A. That is one of the aspects.

(TT 128:25-129:13.)

11

12      51.   Therefore, in light of Examiner Lev's citation of the

13   Baker patent in the copending '009 prosecution (in which Mr.

14   Schumann had previously disclosed the identical prior art as in

15   the '716 prosecution), and Examiner Lev's reliance on the Baker

16   patent to reject claim limitations that were also present in the

17   '716 application, the court finds that the Baker patent meets the

18   "reasonable examiner" materiality standard and should have been

19   disclosed to Examiner Trafton.[5]

20   ───────────────

21      [5]   McKesson at times blurred the distinction between the
     tests for the materiality of the prior art Baker patent, and for
22   the materiality of Examiner Lev's rejections in the copending
     '009 prosecution, discussed *infra*. The "Dayco test" (also
23   discussed *infra*) requiring "substantially similar" claims relates
     to the materiality of the rejections, and confirms that those
     rejections are material. The "substantial similarity" between the
24   rejected '009 claims and the '716 claims is relevant to, but is
     not determinative of, the Baker patent's materiality.  There is
25   no requirement that a prior art reference be used to reject
     "substantially similar" claims in order to be material.
26   Moreover, the prior art reference itself need not exhibit any
     specific threshold level of "similarity" with the patent at issue
27   to be relevant.  Critikon, 120 F.3d at 1258 (reversing
     non-materiality finding where the prior art was
28                                          (continued...)

52.  Additionally, the court also finds the Baker patent material because it contradicts the position Mr. Schumann took in arguing for issuance of the '716 patent.  See Critikon, 120 F.3d at 1258.  In Critikon, the Federal Circuit reversed the district court's findings of non-materiality and lack of intent, in a case where a prior art patent had been withheld from the Examiner. The Federal Circuit found that, even though the undisclosed patent overall was "substantially different" from the patent at issue, it was material because it included a "retaining means," and the patentee had "relied on the novelty of the 'retaining means' . . . to gain allowance of the patent application."  Id.; see also Hoffman-La Roche, 323 F.3d at 1368 (a "reasonable examiner would have wanted to know that the patentability argument" made by the patentee was actually unsupported by their experimental results, and thus those results were material).

53.  In this case, the Baker patent includes the features relied upon by Mr. Schumann to argue for patentability of the '716 patent.  In responding to an Office Action, Mr. Schumann told Examiner Trafton that:

> None of the references either singularly or in combination teach or suggest the claimed invention. In addition to numerous other differences, none of the references teach the three node approach to communications as provided in the claimed invention.  In the present invention, the first node of communication is a main or central computer . . . The second node of communication are the base stations which are wired to the main computer . . . . The third node of communication in the present invention is the portable handheld patient terminal which cooperates with the base stations to provide for

---

[5](...continued)
"substantially different" and "operate[d] differently," but "nonetheless [had] relevant features").

23

> wireless transmission of data between the base station and the patient terminal.

(TX W-00124.)   Mr. Schumann could not have made this patentability argument if Examiner Trafton had the opportunity to consider the Baker patent.   Both parties' experts agreed that the Baker patent teaches a three-node approach to communications similar to that claimed in the '716 patent.   (TT 264:5-265:22 [Dr. Fagan]; TT 446:1-18 [Dr. Bims].)   Indeed, in the '716 patent's three nodes are plainly depicted in the Baker patent's Figure 1.   (TX AA-00002.)   Accordingly, the court finds that, as Dr. Lawrence Fagan testified, Mr. Schumann's representation to Examiner Trafton, above, would be inaccurate had the Baker patent been added to the mix of prior art.   (TT 282:1-24.)   Thus, for all of the reasons stated above, the court finds the Baker patent was highly material prior art to the '716 prosecution.

54.   McKesson raised several arguments why the Baker patent should be found not material.   The court rejects those arguments for the following reasons:

55.   First, the Baker patent is not cumulative of the other prior art cited to Examiner Trafton in the '716 prosecution. McKesson's legal expert, Thomas Smegal ("Mr. Smegal"), opined that Baker is cumulative because one could find all of its elements by combining two other prior art references, the Blum and Hawkins patents.   (TT 497:5-498:1.)   However, this is not the standard for materiality.

56.   A withheld reference is not cumulative and may be "highly material when it discloses a more complete combination of relevant features, even if those features are before the patent

1   examiner in other references." Semiconductor Energy Lab. Co. v.

2   Samsung Elecs. Co., 204 F.3d 1368, 1374 (Fed. Cir. 2000).  The

3   Baker patent is not cumulative under this controlling standard.

4        57.  Initially, the court finds significant that Examiner

5   Lev, who already had both the Blum and Hawkins patents before him

6   (TX X-00130), added the Baker patent to the mix of prior art in

7   the '009 prosecution, and then relied on it in rejecting claims

8   to a portable handheld terminal, as discussed above.  Clearly,

9   Examiner Lev did not view Baker as cumulative, but rather treated

10  it as an important *addition* to the prior art previously cited by

11  Mr. Schumann.

12       58.  Furthermore, as the court found above, the Baker patent

13  more explicitly and clearly discloses a three-node wireless

14  communications system than either the Blum or Hawkins patents.

15  Accordingly, the Baker patent is not cumulative because

16  admittedly "no reference before the examiner disclosed this

17  combination of required elements." GFI, Inc. v. Franklin Corp.,

18  265 F.3d 1268, 1274 (Fed. Cir. 2001).

19       59.  Also, the court is not called upon to determine whether

20  the Baker patent would have affirmatively invalidated the '716

21  patent.  While Bridge did present such evidence from Dr. Fagan

22  (TT 276:16-281:3), prior art can be material even where it would

23  not invalidate a patent.  Molins, 48 F.3d at 1180.  The question

24  is whether a reasonable examiner would have been substantially

25  likely to consider the Baker patent important to the evaluation

26  of the '716 application.  Given the similarity of the core

27  features of the Baker patent to the subject matter of the '716

28  patent, it certainly meets that level of interest.  See Akron

25

1  Polymer Container Corp. v. Exxel Container, Inc., 148 F.3d 1380,

2  1382 (Fed. Cir. 1998) (concluding that in light of the

3  "considerable overlapping content in the specifications and

4  claims of the two applications . . . the Venus application was

5  highly material").

6      60.  McKesson also argued that Baker was not material

7  because it related to a cordless telephone system, rather than a

8  system for transmitting and storing medical patient data.  (See

9  McKesson Information Solutions Inc.'s Trial Brief for Phase 1

10 Trial on Inequitable Conduct [Docket No. 638] at 10:13-17; TT

11 246:24-247:1.)  This narrow view of materiality is belied by Mr.

12 Schumann's own testimony and his conduct in prosecuting the

13 copending patent applications.  The 33 prior art patents that Mr.

14 Schumann did disclose to both the '716 and '009 examiners

15 included patents relating to "monitoring test animal

16 activity," a "security system," and a "theft detection system."

17 (TX V 00069-70; TX W 00095-96.)  None of these related to patient

18 identification systems, yet Mr. Schumann disclosed them in

19 accordance with his duty of good faith and candor toward the PTO.

20 (TX W-00093, TX V-00068.)  Moreover, Mr. Schumann cited as

21 relevant at least five cordless telephone references to the '716

22 Examiner.  (TX W 00105-00107.)  As Mr. Schumann testified at

23 trial, patents can be material where there is "a different

24 application even though the underlying technology might be

25 relevant to the case that you're handling."  (TT 89:24-90:1.)

26 Furthermore, McKesson's expert, Dr. Bims, confirmed that "three

27 node wireless systems which are used for realtime interactive

28 exchange of data"--such as disclosed in the Baker patent--are

material from a scientific standpoint.  (TT 463:13-464:10.)
Finally, Examiner Lev's reliance on the Baker patent in issuing
rejections, discussed above, additionally confirms that wireless
technology, whether or not applied in the medical field, meets
the "reasonable examiner" test in this case.

### b.   Intent

61.   Having determined that the Baker patent is highly
material and not cumulative, the court next addresses whether
Bridge has established intent to deceive by clear and convincing
evidence.

62.   The overwhelming circumstantial evidence, combined with
Mr. Schumann's failure to provide a credible explanation
for the nondisclosure, leads the court to find that Bridge has
proven intent by clear and convincing evidence on multiple,
alternative grounds.

63.   First, the Federal Circuit's decision in <u>Bruno Indep.</u>
<u>Living Aids, Inc. v. Acorn Mobility Servs.</u>, 394 F.3d 1348 (Fed.
Cir. 2005), is instructive here.  In <u>Bruno</u>, a prior art stairlift
("the Wecolator") was not disclosed to the PTO during prosecution
of the patent-in-suit.  It was, however, concurrently disclosed
to the FDA in seeking approval to sell a product covered by the
patent.  <u>Id.</u> at 1350.  The Federal Circuit affirmed the judgment
of unenforceability, stating: "[t]he fact that an official of
Bruno, who was involved in both the FDA and PTO submissions,
chose to disclose the Wecolator to the FDA, but not to the PTO,
certainly supports a finding of deceptive intent."  <u>Id.</u>  Here,
the circumstantial evidence of intent is even stronger than in
<u>Bruno</u>.  There, the applicant's knowledge of materiality was

27

1  inferred from disclosure to the FDA.  In this case, Mr. Schumann

2  was informed of the Baker patent's materiality by the PTO itself

3  when Examiner Lev brought the patent to his attention, suggested

4  cancellation of certain claims, and then rejected claims as

5  obvious in light of Baker--including claim elements that were

6  present in the '716 application.

7       64.  Mr. Schumann's knowledge that the Baker patent was

8  material is further confirmed by his disclosure of the patent to

9  Examiner Yusko in the copending '441 prosecution.  (TX Y-00079.)

10  Under Bruno, this simultaneous withholding from one examiner

11  while disclosing to another examiner supports an inference of

12  deceptive intent.  See also Molins, 48 F.3d at 1182 ("[f]ailure

13  to cite to the PTO a material reference cited elsewhere in the

14  world justifies a strong inference that the withholding was

15  intentional").

16       65.  Second, the timing of Mr. Schumann's telephone

17  conference with Examiner Lev provides additional support for

18  inferring deceptive intent.  The call took place on October 23,

19  1987 during which Examiner Lev discussed only one piece of prior

20  art (the Baker patent), and suggested cancellation of several

21  claims in the '009 application based on Baker.  (TX X-00062.)  It

22  was only seventeen days earlier that Mr. Schumann had made the

23  representation to Examiner Trafton that the prior art does not

24  disclose the "three-node approach to communications" as provided

25  in the claimed invention.  (TX W-00124.)  Mr. Schumann could not

26  have (or certainly should not have) missed Baker's significance,

27  given that it rendered his recent statement to Examiner Trafton

28  untrue, further confirming that intent to deceive should be

28

inferred.  See, e.g., GFI, 265 F.3d at 1275 ("[w]e have

held deceptive intent to be shown where a patentee withheld

references and made an argument for patentability that could not

have been made had the art been disclosed"); LaBounty Mfg., 958

F.2d at 1076 (superseded on other grounds by revision to Rule

1.56)("[T]he evidence amply supports an inference that LaBounty

acted with culpable intent to mislead or deceive the PTO by

withholding its own known prior art devices and by making an

argument for patentability which could not have been made had the

art been disclosed.").

    66.  Third, Mr. Schumann admits that he knew that his duty

to disclose material information in the '716 prosecution

continued until that patent issued on August 15, 1989.

(TT 50:23-51:2.)  After learning of the Baker patent on October

23, 1987 from Examiner Lev, Mr. Schumann continued to actively

prosecute the '716 patent for another 22 months until his

admitted duty of disclosure expired.  (See TT 127:6-16.)  During

this extended period of time when Mr. Schumann did nothing to

bring Baker to the attention of the '716 examiner, Examiner

Lev again highlighted the materiality of Baker for Mr. Schumann

when he rejected the copending '009 patent claims based on Baker.

(TT 125:5-8; TX X-00066-67.)  Also during this period, Mr.

Schumann himself evidenced his realization of the strength of the

Baker patent when he chose not to even attempt to overcome

Examiner Lev's rejection based on Baker and cancelled the

claims in the '009 application that were rejected due to Baker.

(TT 131:8-132:1; TX X-00077.)  Given that the features Mr.

Schumann cancelled in the '009 prosecution because of Baker

included, according to Mr. Schumann's own admission, aspects of the invention under review in the '716 prosecution (TT 128:25-129:13), Mr. Schumann either knew or should have known that the Baker patent was material in the '716 case.  For this reason as well, deceptive intent is established.  <u>See, e.g.</u>, <u>Brasseler, U.S.A. I., L.P. v. Stryker Sales Corp.</u>, 267 F.3d 1370, 1376 (Fed. Cir. 2001) ("intent may be inferred where a patent applicant knew, or should have known, that withheld information could be material to the PTO's consideration of the patent application").

67.  Fourth, Mr. Schumann did not proffer a single "credible explanation" for his failure to disclose the Baker patent to Examiner Trafton.  <u>Ferring B.V. v. Barr Labs., Inc.</u>, 437 F.3d 1181,1191 (Fed. Cir. 2006); <u>Bruno</u>, 394 F.3d at 1354.  Mr. Schumann's most prominent "explanation" is that looking at the Baker reference now, he believes it is cumulative. (TT 221:17-21.)  Not only does the court find Baker not cumulative for the reasons set forth above, such "contemporaneous evidence that he did not believe [Baker] material" cannot explain away an inference of an "intent to mislead."  <u>Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.</u>, 326 F.3d 1226, 1241 (Fed. Cir. 2003) ("Mr. Pilard's assessment occurred after the issuance of the '011 patent and, thus, does not shed light on . . . intent with regard to the prosecution of the '011 patent application").  Mr. Schumann repeatedly testified that he has no recollection whatsoever of prosecuting the '716 patent (TT 212:2-5; 218:2-6; 222:1-22), leaving the record wanting of the required evidence of an explanation *contemporaneous* with the

1  prosecution of the '716 patent.  See also Brasseler, 267 F.3d at

2  1377 (affirming explanation as "incredible" where patentee "could

3  not recall having discussed any potential bar events" material to

4  the prosecution of the patent-at-issue).

5      68.  Even if the "hindsight" explanation offered by Mr.

6  Schumann could suffice as a legal matter, the court does not find

7  it credible.  Mr. Schumann suggested that he must have analyzed

8  the Baker patent and determined that it was not material to the

9  '716 patent.  (TT 246:14-20 ["I've got to assume it was

10 reviewed for materiality and a decision was made not to cite

11 it."].)  But there is no evidence that such an analysis actually

12 took place.  No notes or records from Mr. Schumann's files were

13 offered documenting that Mr. Schumann either reviewed Baker or

14 made an affirmative decision that it was not material to the '716

15 prosecution.  Moreover, based on the following sequence of

16 events, Mr. Schumann's explanation strains credulity:

17 (1) Examiner Lev located the Baker patent on his own; (2) he

18 brought it to Mr. Schumann's attention in a telephone interview;

19 (3) he suggested the cancellation of certain '009 claims, and

20 then issued a rejection of those claims based in part on Baker;

21 (4) shortly thereafter, Mr. Schumann found that the rejection

22 based on Baker could not be overcome, requiring him to cancel the

23 claims (regarding a handheld patient terminal system

24 communicating wirelessly with base stations and via wires with a

25 remote central computer) in order to continue with the '009

26 prosecution; (5) finally, even though Mr. Schumann had disclosed

27 the same prior art in both the '009 and '716 prosecutions through

28 that point in time, he concluded that the Baker patent had no

31

1   bearing on the '716 prosecution (which involved the same

2   three-node wireless system rejected in the '009 prosecution).

3        69.   Furthermore, the notion that Mr. Schumann might have

4   made a materiality determination regarding the Baker patent and

5   not produced it based on that assessment is also belied by the

6   very practices and procedures he purportedly always followed.

7   Mr. Schumann repeatedly testified that his practice was to be

8   "over inclusive" and to "bend[] over backwards to make sure [he]

9   got everything into the case." (TT 86:2-10; 169:18-19). Thus,

10  Mr. Schumann's explanation that he cut a very fine line in the

11  instance of the Baker patent is simply not credible.

12       70.   In sum, this case bears strong similarity to Critikon,

13  Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253,

14  1256 (Fed. Cir. 1997). In Critikon, the applicant had failed to

15  disclose a prior art patent ("the McDonald patent") to the PTO

16  during prosecution, but the district court found both materiality

17  and intent lacking at the conclusion of a bench trial. The

18  Federal Circuit reversed on both issues, and entered judgment of

19  unenforceability. Id. at 1260. Like the Baker patent in this

20  case, the McDonald patent was material despite being

21  "substantially different" from the claimed invention, because it

22  included a claim limitation the patentee had relied on in arguing

23  for patentability. Id. at 1258. Given the high degree of

24  materiality, and the applicant's undisputed knowledge of that

25  materiality, the Federal Circuit held that:

26          A relatively high degree of intent may be inferred
            under the facts of this case. Critikon was aware of the
27          McDonald Patent. It was aware that the 'retaining means'
            was a point of novelty the examiner relied upon during
28          the course of prosecution . . . . And, despite this, it

did not disclose the patent or provide a good faith
explanation for not disclosing the patent.

Id. at 1256.  Similar to Mr. Schumann's reasons here, one
patentee in Critikon argued that he believed the prior art
reference was not material, and the other claimed he could not
remember it.  Id.  The Federal Circuit rejected these
"explanations," because there was evidence the patentees were
aware of the McDonald patent's materiality, since they had "cited
the McDonald patent to the PTO in several other patent
proceedings," just like Mr. Schumann did when he submitted the
Baker reference in the '441 prosecution.  Id.  While the district
court in Critikon had found the applicants' testimony "credible
under the totality of the circumstances," the Federal Circuit
rejected this finding as unsupported and noted that the record
"does not reveal a single instance where [the applicants]
provided a good faith explanation for the exclusion."  Id. at
1257.  On these facts, the Federal Circuit reversed the judgment
of enforceability and found the patent at issue unenforceable.
Id. at 1258.

71.  Given the Federal Circuit's guidance in Critikon, the
court infers deceptive intent here.

72.  Based on any one of the foregoing reasons, the evidence
overwhelmingly establishes that Mr. Schumann knew of the Baker
patent, knew or should have known that it could be material to
the '716 prosecution, and yet withheld that prior art from
Examiner Trafton.  Under the totality of circumstances, the court
finds that Mr. Schumann failed to disclose the Baker patent in
the '716 prosecution under circumstances proving an intent to

33

deceive.

### 2. Nondisclosure of the Rejections in the '009 Prosecution

#### a. Materiality

73. While Mr. Schumann's failure to disclose the Baker reference "alone supports unenforceability," GFI, 265 F.3d at 1275, a finding of unenforceability of the '716 patent is further supported by Mr. Schumann's failure to inform Examiner Trafton of two adverse Office Actions by Examiner Lev in the '009 prosecution. Said Office Actions, namely, the rejections of certain '009 claims, were material to the '716 prosecution.

74. The law requires that material rejections in one prosecution be disclosed to the examiner in a copending case. As stated by the Federal Circuit in Dayco Products, Inc. v. Total Containment, Inc., 329 F.3d 1358, 1368 (Fed. Cir. 2003):

> When prosecuting claims before the Patent Office, a patent applicant is, at least implicitly, asserting that those claims are patentable. A prior rejection of a substantially similar claim refutes, or is inconsistent with the position that those claims are patentable. An adverse decision by another examiner, therefore, meets the materiality standard.

McKesson repeatedly has asserted that the 2003 Dayco decision created a *new* disclosure requirement that does not apply to Mr. Schumann's prosecution of the '716 patent in the 1980s. The court rejected that argument in its ruling on the parties' cross-motions for summary judgment on the issue of inequitable conduct, and rejects it again here.[6] The materiality of an Office Action

---

[6]    See Mem. & Order, filed Aug. 11, 2005 (Docket #533), at 10 n.8: "In Dayco Prods., the court simply stated that it 'had never addressed whether the prior rejection of a substantially

(continued...)

stems from the Manual of Patent Examination and Procedure
("MPEP") provision requiring disclosure of "information within
[the applicants'] knowledge as to other copending United States
applications which are 'material to the examiner' of the
application in question,"--a provision in existence since before
any of the applications here were filed.  See MPEP § 2001.06(b)
(4th Ed., Rev. 8, Oct. 1981) (quoting 37 C.F.R. 1.56 ("Rule
56")).

        75.   The principle requiring disclosure of material events
during prosecution, including rejections, had been recognized
prior to Dayco.  See, e.g., Li Second Family Ltd. P'ship v.
Toshiba Corp., 231 F.3d 1373 1380-81 (Fed. Cir. 2000) (affirming
inequitable conduct judgment based in part on failure to disclose
decision of PTO Board of Appeals in copending application);
Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., 837 F.
Supp. 1444, 1474 (N.D. Ind. 1992) (finding inequitable conduct
based on failure to disclose rejection in copending case).
The Federal Circuit in Dayco applied this rule to patents that
were, like the '716 patent, prosecuted in the 1980s.  Indeed,
McKesson's own legal expert, Mr. Smegal, a former patent examiner
with 40 years' experience prosecuting patents (TT 465:10-466:24),
testified that Dayco did not create a new duty of disclosure.
(TT 532:12-14.)

_____

[6](...continued)
similar claim in a copending United States application is
material;' it did not make that finding in the first instance.
Rather, it applied the duty to disclose such information, as
embodied in 37 C.F.R. § 1.56(b)(2), to conduct that had occurred
more than a decade earlier.  As such, Dayco Prods. is not
dispositive of the materiality of this nondisclosure."

76.   Having determined that the rule requiring disclosure of material rejections applies in this case, the court turns to whether Examiner Lev's two rejections in the '009 prosecution were material and should have been disclosed to Examiner Trafton in the '716 prosecution.  Under _Dayco_, the rejections are material if the rejected claims were "substantially similar" to the claims pending before Examiner Trafton.[7]  _Dayco_, 329 F.3d at 1368.  McKesson relied on "redline" comparisons of the various claims to demonstrate that there are wording differences, and even some differences in claim limitations, but the law does not require that the claims be completely identical to trigger the disclosure requirement.  _Dayco_, 329 F.3d at 1361 (finding claims "substantially similar" when the "claims submitted in the '196 family of applications were in _some respects_ substantially identical") (emphasis added).  Similarly, here, the rejected '009 claims were "in some respects" identical to the '716's Claim 1, directly implicating the materiality of the '009 rejections to the '716 prosecution.

77.   The court has found, above, that the rejected '009 claims were "substantially similar" to the '716's Claim 1.  As such, applying the controlling law, the court finds that Mr.

_____

[7]    McKesson argues that _Dayco_ requires that the rejected claims be substantially similar "_in content and scope_" to the '716 claims.  However, this language does not appear in the _Dayco_ holding:  "We hold that a contrary decision of another examiner reviewing a _substantially similar claim_ meets the . . . 'reasonable examiner' threshold materiality test."  329 F.3d at 1368 (emphasis added).  Moreover, McKesson has not provided any persuasive explanation for how this language substantively alters the result here.  Accordingly, in determining materiality, the court applies the test of whether the rejected '009 claims were "substantially similar" to the '716 claims.

Schumann should have disclosed the adverse Office Actions in the '009 prosecution to Examiner Trafton. Specifically, with respect to the first Office Action on February 26, 1987, rejected claims 15 and 16 of the '009 patent substantially overlapped with the limitations of Claim 1 of the '716 patent, and accordingly, that rejection would have been material to Examiner Trafton. Indeed, these two rejected '009 claims disclosed all three nodes of the '716's patient identification system, with the identical means of communication among the core structures. A reasonable examiner would consider the fact that Examiner Lev had rejected claims containing these very elements important.

78. Additionally, in the second Office Action of December 1, 1987, rejected '009 claims 19, 21, 22 and 23 were substantially similar to the '716's Claim 1, thus making Examiner's Lev's second rejection material to the '716 prosecution. Moreover, this second rejection was particularly material to the '716 prosecution because Examiner Lev relied on the Baker patent, which had not been disclosed in the '716 prosecution, to reject the "unique address" limitation of the '009 claims, which was also a limitation of the '716 patent. Mr. Schumann did not contest this rejection, but instead cancelled the '009 claims that Examiner Lev had rejected over the Baker patent "in an effort to obtain early allowance of at least some claims to the invention." (TX X-00077.) The court finds this information highly material--a reasonable examiner would find it important that (1) another examiner had rejected a claim limitation that he himself was considering, (2) that another examiner had done so based on prior art that was not before him,

37

1   and (3) the applicant had acquiesced in the rejection and

2   cancelled all claims that had been rejected based on that same

3   prior art.

4   79. Beyond meeting the Dayco "substantially similar" test,

5   the two rejections by Examiner Lev are material for the

6   independent reason that they contradict Mr. Schumann's

7   argument for patentability in the '716 prosecution. See Bruno,

8   394 F.3d at 1353 ("Had the examiner known about the Wecolator,

9   however, Bruno could not have touted the front offset

10  swivel as a point of novelty."). In responding to Examiner

11  Trafton's rejection of every claim of the '716 application, Mr.

12  Schumann attempted to distinguish the prior art and argued that

13  the '716 invention was novel and patentable because it

14  encompassed a three-node approach to communications, with

15  a central computer wired to the base stations, which then

16  communicated wirelessly with the portable handheld patient

17  terminals. (TX W-00124.) Examiner Lev rejected as obvious this

18  very combination of elements at least three times. Claim 16,

19  rejected in the first Office Action, claimed a "central

20  computer system electrically wired to the base station means,"

21  and the base station means included "means for wireless

22  communication with the portable handheld terminal." (TX X-

23  00118.) Amended Claims 15 and 16, rejected by Examiner Lev on

24  December 1, 1987, included "base station means including RF

25  transceiver means for communication with the portable

26  handheld terminal," and "a central computer system electrically

27  wired to the base station means." (TX X-00054-55.) Finally,

28  Claim 21, rejected on December 1, 1987, claimed electromagnetic

38

(i.e. wireless) transmission of data between a handheld terminal and a base station, and data over voice (i.e. wired) transmission of data between the base station and a central computer. (TX X-00056-57.)  Examiner Lev's repeated rejection of this combination of elements directly conflicted with Mr. Schumann's patentability argument to Examiner Trafton.

80.  In sum, the February 27, 1987 and December 1, 1987 rejections in the '009 prosecution were material because (1) they involved claims substantially similar to those pending in the '716 application, and (2) they directly addressed the point of novelty Mr. Schumann had advanced to Examiner Trafton.

81.  The court rejects McKesson's contention that Mr. Schumann satisfied his duty to disclose these two material rejections by merely disclosing the existence of the copending '009 application to Examiner Trafton.  McKesson relies primarily on Akron Polymer Container Corp. v. Exxel Container, Inc., 148 F.3d 1380 (Fed. Cir. 1998), for its position.  In that case, the charge of inequitable conduct turned on an attorney's failure to disclose the copending application, itself, to an examiner.  Id. at 1381.  In Akron Polymer there was no allegation of deceit regarding rejections or other material information in either application.  Thus Akron Polymer is inapposite.  Moreover, contrary to McKesson's arguments, the MPEP requires far more than disclosure of the copending application--it requires disclosure of "information within [the applicants'] knowledge as to other copending United States applications."  MPEP § 2001.06(b) (4th Ed., Rev. 8, Oct. 1981).  That disclosure of a copending application does not constitute disclosure of all information

regarding that application was confirmed by the Federal Circuit in <u>Li Second Family</u>.  There, the Federal Circuit affirmed a finding of inequitable conduct for failure to disclose the PTO Board's decision in a copending case, even though the existence of the co-pending case had been disclosed:

> Although the genealogy chart filed by Li shows the chain of parent applications and related applications, including the '758 application, we agree . . . that the chart does not adequately disclose the relevant information—the Board's decision regarding priority dates. . . . Li's submission of the genealogy chart . . . was not sufficient to disclose the Board's decision to Examiner Saba.

231 F.3d at 1378-79.  The controlling law plainly imposes a duty of disclosure beyond citation of the co-pending application alone.  Indeed, McKesson's expert, Mr. Smegal, concurred and testified that there is a duty to disclose material rejections. (TT 492:24-493:4; 535:18-536:14.)

### b. Intent

82.  A patentee aware of material information but who fails to disclose it to the PTO "can expect to have great difficulty in establishing subjective good faith sufficient to overcome an inference of intent to mislead."  <u>Bristol-Myers Squibb</u>, 326 F.3d at 1239.  Mr. Schumann undeniably was aware of the rejections; he responded to both of them.  Moreover, he either knew or should have known that they were material to the '716 application, given that those rejections directly contradicted the point of novelty Mr. Schumann had argued to Examiner Trafton regarding the '716 claims.  Thus, Mr. Schumann must provide "facts supporting a plausible justification or excuse" for the nondisclosure. <u>Paragon</u>, 984 F.2d at 1191.

1     83.  Here, Mr. Schumann offers two excuses for the

2  nondisclosure of the '009 rejections.  The court does not find

3  either credible.  First, Mr. Schumann speculates that he probably

4  did not believe activity in the '009 application was material to

5  the '716 prosecution because the '009 case involved only a

6  terminal, while the '716 involved an entire "system."  (See TT

7  239:18-240:4; 155:21-156:20.)  This excuse is contradicted by the

8  actual wording of the claims rejected by Examiner Lev, which, as

9  discussed above, included all of the elements of a three-node

10  wireless system.  Further, Mr. Schumann admitted on cross

11  examination that his terminal/system argument was a

12  distinction without a difference.  (TT 242:3-243:6.)  Thus, the

13  terminal/system distinction is not accurate and does not overcome

14  the inference of deceptive intent that arises from Mr. Schumann's

15  withholding of known material information.

16     84.  Second, Mr. Schumann attempts to justify his conduct by

17  explaining that he acted in conformance with his firm's policy at

18  the time.

19     Q.   In your practice, do you follow that? Do you believe
        that your duty of disclosure requires the disclosure of
20      a substantial – of a contrary decision regarding a
        substantial[ly] similar claim in a copending
21      application?

22     A.   I can tell you what the practice was over the 25 years
        I've been in the practice.  We did – we never did
23      docket a review of office actions coming in on a
        co-pending case for citation in another copending
24      case.

25                              * * *

26     Q.   Isn't it true that you believe that if a rejection
        in a co-pending application, the rejection itself, is
27      relevant to an application that you're prosecuting,
        you have a duty to disclose that rejection even

28

41

1    if you've disclosed the existence of the co-pending
2    application?

                              ***

3
4    A.   Given our operating standards, the way we handle
          applications back during the time in the eighties when
5         this case was being prosecuted, we did not have
          procedures set up to cite the office action in a
6         co-pending case.  We looked at the references and we
          cited references which we felt were material.

7    (TT 41:11-19; 229:5-21.)  Preliminarily, the court does not find

8    Mr. Schumann's trial testimony credible, as it appears to be a

9    product of newly developed hindsight.  Indeed, Mr. Schumann

10   contradicted his trial testimony in his deposition, testifying

11   there that he *would* disclose an adverse Office Action, if it was

12   material:

13   Q.   The sense I'm getting from your testimony is that
          even if it's relevant that in the normal course it's
14        not necessary to disclose a rejection as long as the
          references are disclosed in the other actions; is
15        that true? Am I –

16                            ***

17   Q.   If I've misstated it, I want to get it right, so
          that's why I'm asking?

18
19   A.   Of course, *if it was deemed to be relevant and in your
          duty to disclose you should disclose it, you would do
20        that.* I'm just saying that the typical normal course is
          that it's rare that you would bring an office action to
21        the attention of an examiner in a copending
          case.  *But, of course, if there are issues of relevancy
22        you would do that.*

23   (M. Schumann Depo. Tr. at 127:10-128:4 [emphasis added].)

24        85.  Even if Mr. Schumann's firm did have a policy of never

25   disclosing Office Actions in copending prosecutions, that policy

26   cannot erase the inference of deceptive intent that arises

27   from withholding information Mr. Schumann knew or should have

28   known could be material to patentability.  If his former law firm

                                42

1  indeed had a policy of never disclosing Office Actions, that

2  policy was contrary to the duty of disclosure, as confirmed by

3  both parties' patent law experts.  (TT 313:14-314:2 [Bridge's

4  patent law expert, Mr. Sheridan, testified in pertinent part,

5  "[T]he standard wasn't so much to disclose the fact of a

6  copending application as to disclose relevant information that

7  occurred or that came to light in the course of prosecution of

8  that copending application."]; TT 492:24-493:4; 535:18-536:14

9  [McKesson's patent law expert, Mr. Smegal, testified in pertinent

10 part, "Mr. Schumann . . . had an obligation under Rule 56 to

11 disclose material information . . . . If a . . . rejection, if

12 that document satisfied that criteria with respect to claims of

13 substantially similar[] content and scope, then he had a duty as

14 we've always had a duty.]")

15      86.  Attorneys cannot insulate themselves against charges of

16 inequitable conduct by instituting policies that prevent them

17 from complying with the law, as Mr. Schumann claims his former

18 firm apparently did in the 1980s.  Under Federal Circuit case

19 law, "studied ignorance" such as that professed by Mr.

20 Schumann, supports, rather than defeats, an inference of

21 deceptive intent.  Brasseler, 267 F.3d at 1377.  In Brassler, the

22 district court found that the prosecuting attorney deliberately

23 avoided learning about a potential on-sale bar event because "he

24 was reluctant to learn the specific facts pertaining to earlier

25 sales that he would have been obliged to disclose to the PTO."

26 Id.  The Federal Circuit affirmed, stating that "one should not

27 be able to cultivate ignorance, or disregard numerous warnings

28 that material information or prior art may exist, merely to avoid

actual knowledge of that information or prior art. . . . Where one does, deceptive intent may be inferred." Id. at 1383 (quotation omitted).

87. Here, Mr. Schumann's new claim at trial that he never disclosed Office Actions, and that he was simply complying with firm policy when he failed to disclose Examiner Lev's rejections, is the same sort of "studied refusal to investigate" that supported an inference of deceptive intent in Brasseler. Id. Mr. Schumann either knew, or should have known, that rejections can be material in copending applications, and that Examiner Lev's rejections addressed the very point of novelty he had advanced to Examiner Trafton. This knowledge put him on notice that an investigation was necessary, regardless of his firm's policy. Id. at 1385 ("Attorneys must conduct meaningful inquiries when the surrounding factual circumstances would cause a reasonable attorney to understand that relevant and questionable material information should be assessed.").

88. Finally, while Mr. Schumann's disclosure of the co-pendency of the '009 application to Examiner Trafton is some evidence of a lack of intent to deceive under Akron Polymer,[8] weighing all the evidence here, as the court must, said disclosure does not overcome the inference of an intent to deceive established by the above facts.

89. In sum, the court finds Mr. Schumann's two stated justifications for failure to disclose the rejections are wholly

---

[8]   148 F.3d at 1384 (finding that disclosure of the copending application is a fact that "points away from an intent to deceive").

44

insufficient to overcome the inference of intent that arises when
"the withheld information is material and the patentee knew or
should have known of that materiality." Bristol-Myers, 325 F.3d
at 1239 (affirming finding of deceptive intent where the
patentee's "attempted justifications for [the nondisclosure] were
not credible").

   **3.   Nondisclosure of the Notice of Allowability of the
          '372 Patent**

   **a.   Materiality**

   90.   A finding of unenforceability is further supported by
Mr. Schumann's conduct in failing to disclose the Notice of
Allowability of the '372 patent in the '716 prosecution.

   91.   The court analyzes this nondisclosure under the same
rule discussed above, established in the MPEP and confirmed in
Dayco, that an applicant must disclose material "*information* . .
. as to copending United States applications . . . ." MPEP §
2001.06(b) (4th Ed., Rev. 8, Oct. 1981) (emphasis added).  The
MPEP instructs that information relating to copending U.S. patent
applications "in which similar subject matter but patentably
indistinct claims are present" must be disclosed to the examiner
of each of the involved applications. Dayco, 329 F.3d at 1365
(quoting MPEP § 2001.06(b)).  Information from the prosecution of
a patent application is "highly material" to the prosecution of a
copending application where "it could have conceivably served as
the basis of a double patenting rejection." Id. (citation and
internal quotation omitted).  The doctrine of double patenting
"prohibits an inventor from obtaining a second patent for claims
that are not patentably distinct from the claims of [a] first

45

1  patent," id. (citation and internal quotation omitted), thus

2  preventing the extension of the statutory patent term.  In re

3  Emert, 124 F.3d 1458, 1460 (Fed. Cir. 1997).  A notice of

4  allowance of a patent with claims similar to those of a

5  co-pending application can generate a double-patenting rejection

6  for that copending application.  See id. McKesson's expert, Mr.

7  Smegal, agreed at his deposition that the "federal circuit had

8  articulated the duty to disclose information such as a rejection

9  or notice of allowance of a substantially similar case in a

10 copending application" in the Dayco decision. (T. Smegal Depo. at

11 186:2-187:7 [emphasis added].)

12      92.  Here again, McKesson's defense that Dayco created new

13 law fails, and the court rejects McKesson's contention that the

14 law requires disclosure only of the existence of the copending

15 application, not the allowance of those claims, as discussed

16 above.  McKesson's only remaining argument is that the '372 and

17 '716 claims are not "substantially similar."  The court rejects

18 this argument as well.

19      93.  The court has found above that the allowed '372 claims

20 were "substantially similar" to the '716 claims.  The court finds

21 that this substantial similarity in claim elements renders the

22 allowance of the '372 patent material to the '716 prosecution.

23 While there is one notable variation in the two patents in that

24 the "base station means" of the '716 patent includes a

25 "programmable unique identifier" and "means for only allowing

26 communication with a portable handheld patient terminal means

27 having a corresponding program identifier," while the '372 patent

28 does not, the court nevertheless finds that this difference does

1  not render the allowance of the '372 patent immaterial to the

2  '716 application.  Allowance of the '372 still "could have

3  *conceivably* served as the basis of a double patenting rejection."

4  Dayco, 329 F.3d at 1365 (citation and internal quotation omitted)

5  (emphasis added).  Examiner Trafton should have been given the

6  opportunity to consider whether the added limitations in the '716

7  were non-obvious.  See LaBounty, 958 F.2d at 1076 (When

8  materiality is close it is "all the more necessary that the

9  [information] should have been disclosed to the examiner.  Close

10  cases should be resolved by disclosure, not unilaterally by the

11  applicant.").  Indeed, given that Examiner Lev had rejected the

12  "unique identifier" as obvious (TX X-00066-67), it is certainly

13  conceivable that the '716 could have been rejected under the

14  doctrine of obvious-type double patenting.  The '372 allowance

15  was therefore material and should have been disclosed.

16                    **b.  Intent**

17       94.  The court finds that the '372 allowance was withheld

18  with deceptive intent.  Again, the information Mr. Schumann

19  withheld was highly material.  Mr. Schumann himself confirmed at

20  trial that the two patents "disclose similar subject matter."

21  (TT 64:10-12.)  While Mr. Schumann, looking back, asserts they

22  "claim patentably distinct inventions" (TT 64:12-13), that was a

23  judgment Mr. Schumann was duty-bound to let Examiner Trafton

24  make.  LaBounty, 958 F.2d at 1076.

25       95.  Given the high level of materiality, as with Mr.

26  Schumann's other nondisclosures, Mr. Schumann faces "great

27  difficulty in establishing subjective good faith sufficient to

28  overcome an inference of intent to mislead."  Bristol-Myers, 326

                                47

F.3d at 1239 (citation omitted).  "A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice."  GFI, 265 F.3d at 1275.  Again disclaiming any recollection of the reason he withheld the allowance in the '716 case (TT 224:1-13), Mr. Schumann rests on the implausible explanation that the two patents did not raise a double patenting issue because "the claims were different in those cases."  (TT 135:22-136:23.)  But, by Mr. Schumann's own admission, those claims involved multiple "means-plus-function" claims, which Mr. Schumann conceded are defined by the specification, not just the claims.  (TT 238:2-23.)  And, the entire '716 specification, according to Mr. Schumann, is included in the '372 specification. (TT 238:18-20.)  Mr. Schumann certainly should have known, if he did not know, that an allowance of identical claims might have been important to make of record in the '716 prosecution.

96.  Finally, again, while Mr. Schumann's disclosure of the copendency of the '372 application to Examiner Trafton is some evidence of a lack of intent to deceive under Akron Polymer, weighing all the evidence, said disclosure does not overcome the inference of an intent to deceive established by the above facts.

**C.   Equitable Balancing**

97.  Having found materiality and intent to deceive based on clear and convincing evidence, the court weighs the two against each other to determine whether inequitable conduct has occurred. Bristol-Myers, 326 F.3d at 1234.

98.  A pattern of material nondisclosures, such as present here, weighs firmly in favor of unenforceability.  Ferring, 437

48

F.3d at 1194 (affirming finding of inequitable conduct entered as
a matter of law because "there was not simply a single omission.
Rather, there were multiple omissions over a long period of
time--a fact that heightens the seriousness of the conduct")
(citation omitted); Critikon, 120 F.3d at 1259 ("Given the
materiality and the failure at any point to offer a good faith
explanation of the pattern of nondisclosure, an intent to mislead
may be inferred.").

99.  The items of information Mr. Schumann withheld from
Examiner Trafton, both individually and as a whole, constitute
matter a reasonable examiner would have been substantially likely
to consider important while evaluating patentability of the
'716 patent application, and there is no dispute that Mr.
Schumann was aware of each piece of material information--the
Baker patent, the '009 rejections, and the allowance of the '372
patent.

100. Moreover, the circumstantial evidence here strongly
supports an inference of deceptive intent, and significantly, Mr.
Schumann failed to provide a credible explanation for his
nondisclosures.  Indeed, this is not a case of mistake or
negligence, since Mr. Schumann, an experienced patent prosecutor,
testified that he would make all of the same decisions again if
prosecuting these applications today.  (TT 210:25-211:7.)  That
Mr. Schumann failed to appreciate his duty of disclosure when he
prosecuted the '716 patent, and that he continues in that
wayward position contrary to the law does not excuse his conduct.
See Brasseler, 267 F.3d at 1376 ("a patentee's failure to
appreciate the legal significance of the facts that it failed to

1   disclose did not absolve it of its duty to disclose").

2      101. Weighing materiality against intent, the court finds

3   that each of the nondisclosures set forth above, the Baker

4   patent, the '009 rejections, and the '372 allowance,

5   individually would support judgment of unenforceability.  For

6   each, the showings of materiality and intent are high.  The court

7   finds significant that for each nondisclosure, Mr. Schumann

8   offered nothing other than bare denials of intent, combined with

9   numerous excuses that this court finds implausible and not

10  credible.  <u>Paragon</u>, 984 F.2d at 1190 ("merely conclusory

11  statements or completely insupportable, specious, or conflicting

12  explanations or excuses" are insufficient to defeat a finding of

13  inequitable conduct).  The record compels a finding that the '716

14  patent was procured through inequitable conduct, thereby

15  rendering the '716 patent unenforceable.

16      IT IS SO ORDERED.

17  DATED: June 13, 2006.

18                              /s/ Frank C. Damrell Jr.
                                FRANK C. DAMRELL, Jr.
19                              UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28